**Jesse FULK and Donald Cearlock, Plaintiffs–Appellants,**

v.

**UNITED TRANSPORTATION UNION, Defendant–Appellee.**

No. 96–2849.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 8, 1996.*

Decided Feb. 19, 1997.

---

* This successive appeal has been submitted to the original panel under Operating Procedure 6(b). After an examination of the briefs and the record, we have concluded that oral argument is unnec-

essary; accordingly, the appeal is submitted on the briefs and the record. See Fed.R.App.P. 34(a); Cir. R. 34(f).

**114**

James P. Baker, submitted, Springfield, IL, for Plaintiff–Appellant.

William K. Cavanagh, Cavanagh & O'Hara, Springfield, IL, Kevin C. Brodar, United Transportation Union, Cleveland, OH, for Defendant–Appellee.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

Plaintiffs Jesse Fulk and Donald Cearlock appeal a grant of summary judgment against them in their suit under § 301 of the Labor Management Relations Act case (LMRA). 29 U.S.C. § 185. Fulk and Cearlock were employees of the Norfolk & Southern Railroad (the Railroad) and were members of the United Transportation Union (the Union). This is the plaintiffs' second effort to upset a union membership vote to approve the modification of a collective bargaining agreement.[1]

At this juncture, the plaintiffs are appealing with respect to Count II. They claim that the Union's decision to conduct a membership vote craft-by-craft and district-by-district violated the Union's Constitution. The district court granted summary judgment on the grounds that the plaintiffs had not exhausted their Union grievance procedures. This issue is one for the district court to resolve in its discretion. The district court in this case, however, took an overly restrictive view of its own latitude to assess the plaintiffs' claims. We vacate and remand.

## I. Factual Background

The Union represents workers employed by the Norfolk & Southern Railroad. The Railroad groups workers into several geographic districts, known as "seniority districts." The plaintiffs were members of the Springfield District. The Union membership was also divided into several, considerably larger, geographical units, known as General Committees of Adjustment (GCAs), which were in turn divided into local subcommittees. The plaintiffs were members of the same General Committee of Adjustment, which embraces several seniority districts.

This dispute arose when the Union brought up for membership vote a proposed modification of one of its agreements with the Railroad. The "crew consist" agreement, covering conductors, brakemen and yardmen, governs the size of the crew used to operate each train. The original agreement, adopted

1. The prior appeal involved Count I of their complaint and alleged violations of the Labor Management Reporting and Disclosure Act— namely that the Union's choice of voting procedure in approving the productivity fund's demise discriminated against them because of its asserted bias in favor of rejecting the modification. 29 U.S.C. § 411(a)(1); *Fulk v. United Transp. Union,* 81 F.3d 733 (7th Cir.1996).

in 1984, allowed the Railroad to reduce the crew size from two brakemen and a conductor to one brakeman and one conductor as workers retired or otherwise left the Railroad's employ. As a complement to the reduction in crew size, the Railroad agreed to share, as the crews were reduced, the resulting cost savings with the workers. Whenever a train ran with only two crew members, the Railroad paid $53.25 into a "productivity fund," which was credited to the workers. A separate productivity fund was maintained for each seniority district. The amount paid into each fund depended on the number of trains in that particular district which had been operated with two-member crews.

The two modifications disputed here were negotiated in 1991. First, the crew consist agreement was to be modified to allow the Railroad to operate with one-person crews when the size of the work force within a particular seniority district had declined sufficiently. Second, the productivity funds were to be eliminated. In their place, the Railroad would make a one-time payment in December 1991 of $20,000 to each of its employees and an additional payment of $40,000 to each employee upon death, retirement or termination of employment.

The Union presented each modification separately to the membership for approval. If the membership failed to approve the modification to the crew consist agreement, the whole plan was to be abandoned. However, if the crew reduction were approved, it would go into effect whether or not the vote approved the productivity fund buyout.

The Union leadership decided to implement a different voting procedure for each of the two proposals. The reduction in crew size was put to an aggregate vote of all members of a particular GCA. Votes were tallied within each craft (conductor, brakeman and yardman). Acceptance of the proposal by a majority of each craft's workers was required to approve the new crew consist agreement. In the event, the new crew consist agreement was approved as required by each craft.

The Union leadership put the buyout vote to an independent vote in each seniority district, a smaller group than the GCAs. The result in each district would determine the fate of that district's productivity fund. The Union justified the district-by-district voting procedure for the productivity funds on the grounds that the value of the funds varied from district to district, as did the relative proportion of older workers to younger workers. Within each district, a majority of each craft was again required to approve the proposal. The results of the productivity fund buyout vote were mixed. Some districts approved and others rejected the proposal. Six hundred votes in all were cast within the GCA. Among those voters, the buyout received approval by nearly two-thirds of those voting in each craft. In the Springfield District, however, the proposal failed to carry a majority among the brakemen and therefore lost.

Plaintiffs Fulk and Cearlock complain that the seniority district-by-seniority district voting procedure violated Article 85 of the Union Constitution, which reads:

> The General Chairperson must poll the entire membership holding seniority and working in the craft involved on the property by mail referendum ballot prior to signing any system agreements and be governed by the majority of votes cast.

The Union disputes the plaintiffs' interpretation of the constitution, the issue being whether the productivity fund buyout was a "system agreement."

In December 1991, the plaintiffs wrote a letter to Union President G.T. DuBose. They stated:

> We ... wish to appeal the action and decision of General Chairperson K.N. Thompson, on behalf of all members adversely affected by the way the vote was handled on the productivity fund dated November 18, 1991[ ].
>
> When the vote was counted, he allowed it to be counted on a fund to fund basis. We find nothing in the Constitution to allow the vote to be counted this way, ... as this is a system agreement and not a ... fund agreement.

President DuBose responded briefly by letter: "When changing a system or general rule, it is required that each affected craft

must approve the change. In this particular case approval of both crafts (conductors and brakemen) was not obtained."

It is at this point that the current controversy arose. The plaintiffs attempted to appeal the Union's decision as expressed by its president through the Union's internal procedures, ultimately failing to navigate them successfully. The plaintiffs brought this suit against the Union under § 301 of the LMRA. 29 U.S.C. § 185. The district court granted summary judgment against the plaintiffs on the grounds that they had failed to exhaust their internal Union remedies and appeals procedure before seeking relief in the federal courts.

## II. Analysis

Section 301 of the LMRA does not contain an explicit exhaustion requirement. When suing the employer or union for breach of a collective bargaining agreement, however, exhaustion is required by *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Exhaustion is required, in part, because the procedures prescribed by the collective bargaining agreement were themselves subject to the bargaining process. In *Republic Steel* the Court found that federal labor policy favored requiring employees to "afford the union the opportunity to act on [their] behalf." *Id.* at 653, 85 S.Ct. at 616. Exhaustion was found to "complement[ ] the union's status as exclusive bargaining representative ... [and] enhance the union's prestige with employees." *Id.*

■ In *Clayton* the Court addressed whether grievance procedures which were not bargained for (as in *Republic Steel*) but were instead created by the union in its constitution, like the one before us, also created an exhaustion requirement for the employee-plaintiff. *Clayton v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., et al.,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). The question of exhaustion of internal union procedures tends to arise in cases where the employees are suing the union instead of, or in addition to, the employer, as here. Recognizing that the procedures at issue in *Repub-*

*lic Steel* significantly differ from those procedures which are wholly a creation of the union constitution, the Court found that the policies underlying *Republic Steel* are not necessarily furthered by requiring an adherence to internal union appeals procedures. *Clayton,* 451 U.S. at 687, 101 S.Ct. at 2094. The Court found that "the policy of forestalling judicial interference with internal union affairs is [not] applicable to these cases ... involving the interpretation and application of a union constitution." *Id.* at 687–88, 101 S.Ct. at 2094–95. Thus, "courts have the discretion to decide whether to require exhaustion of internal union procedures" before allowing a suit under § 301 of the LMRA. *Id.* at 689, 101 S.Ct. at 2095. The *Clayton* Court set forth guidelines for the exercise of this discretion:

> In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Id.* (emphasis supplied).

In *Stevens* we held that "disputes 'arising over internal union matters such as those involving the interpretation and application of a union constitution,' activate 'the policy of forestalling judicial interference with internal union affairs,' which was found inapplicable in *Clayton* where the allegations involved statutory policies extending beyond internal union interests." *Stevens v. Northwest Indiana Dist. Council, United Bhd. of Carpenters,* 20 F.3d 720, 732 (7th Cir.1994) (internal citations omitted). Thus we found that a discretionary exhaustion requirement would foster "private resolution of disputes, responsible union self-regulation, union assistance in the interpretation of its governing document, [and] robust union processes," while at the same time giving the district court the flexibility to allow a case to contin-

ue despite the plaintiff's failure to exhaust internal remedies. *Id.*

With this in mind we have previously held that the *Clayton* factors are not exclusive, and "[i]n fact, in considering whether exhaustion was required, a court must look to the reasonableness of imposing it under the circumstances of the situation." *Lewis v. Local Union No. 100 of the Laborers' Int'l Union of N. Am., AFL–CIO,* 750 F.2d 1368, 1380 (7th Cir.1984). Further, "there is nothing clear-cut about the factors that will excuse exhaustion." *Frandsen v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Employees,* 782 F.2d 674, 682 (7th Cir.1986). The district court in this case was required to exercise its discretion in determining whether the plaintiffs needed to exhaust fully their internal procedures before seeking relief in court.

█ The district court held that "[n]one of the factors listed by the Supreme Court in *Clayton* are present in this case. Therefore, the Court cannot entertain Plaintiffs' claim that the Union violated the Union Constitution." Order at 6. This analysis misstates the standard established by *Clayton* and mistakenly applies the factors as if they were exclusive. Instead of dismissing the case

because time to perfect an internal appeal had passed, the district court should have considered all the arguments offered by the plaintiffs to determine whether exhaustion ought to be required. While we leave the determination of these matters to the district court on remand, we will briefly discuss the relevant facts as well as the history of the plaintiffs' internal appeal.

### III. Plaintiffs' Path

The plaintiffs' attempts to navigate the Union's internal grievance procedure [2] began when they wrote a letter to International President DuBose challenging General Chairperson Thompson's (G.C.Thompson) decision. President DuBose responded by letter on December 20, 1991 upholding G.C. Thompson's decision. At that point, the plaintiffs appealed the actions of G.C. Thompson to the General Committee of Adjustment (the Committee). G.C. Thompson responded to this appeal by defending his position in a letter to the Committee. The Committee took no action, prompting the plaintiffs to request that their appeal be forwarded to the Union's Board of Appeals. When the Board of Appeals met, they deter-

2. The Union Constitution contains the following relevant provisions:

Article 16, International President, states that "The International President shall interpret all laws of the organization, decide all questions arising therefrom, and decide all other controversies not provided for under existing laws of the organization, subject to appeal to the Board of Directors—all in conformity with this Constitution."

Article 27, Board of Appeals, provides that "The Board of Appeals shall meet . . . to consider and determine all appeals submitted under the provisions of this Constitution. . . . It shall have no authority to consider and determine any other matter, nor to refer any case to any other tribunal of the organization for a decision except questions arising as to the application of organization law shall be referred to the International President."

Article 75, Appeals, lays out the appeal procedures:

I—TO THE BOARD OF APPEALS. . . .

(d) A local or member of a local may appeal from an action or decision of a General Chairperson to the General Committee of Adjustment, provided the appeal is filed within ninety (90) days from the date the action or decision occurred. Appeals to the General Committee

of Adjustment must be filed with the Secretary of the General Committee and shall be acted upon not later than the next session of the General Committee of Adjustment.

(e) An appeal pending before a General Committee of Adjustment which has not been acted upon within ninety (90) days shall be referred by the Secretary of the General Committee of Adjustment to the Board of Appeals for a decision, provided the appellant makes a request to do so to the Secretary of the General Committee at least thirty (30) days prior to the date the Board of Appeals is scheduled to convene.

(f) An appeal from the decision of the General Committee of Adjustment may be made to the Board of Appeals provided the appeal is filed with the General Secretary and Treasurer within ninety (90) days from the date of the decision of the General Committee of Adjustment.

II—TO THE BOARD OF DIRECTORS

(a) A member or subordinate body may appeal to the Board of Directors from an interpretation of this Constitution made by the International President, provided such appeal is filed with the General Secretary and Treasurer within ninety (90) days from the date the decision by the International President was made.

mined that the plaintiffs should have appealed President DuBose's letter to the Board of Directors, and that having failed to do so, their appeal was now barred by the time limits.

The Union argues that the district court's dismissal of the plaintiffs' claims should be affirmed because Fulk and Cearlock did not exhaust their internal Union remedies. The plaintiffs argue that the summary judgment should be reversed because they had legitimate reasons for failing to correctly navigate the Union's internal appellate process. First, the plaintiffs argue that the Union failed to inform them that they had appealed through the wrong body. Second, the plaintiffs argue that the Union Constitution is ambiguous and unclear, and that this ambiguity should be construed against the Union. Finally, the plaintiffs argue that, even if they had completed their appeal properly, the Union could not have granted them a remedy comparable to the relief they are seeking in this § 301 action in federal court.

## IV. Plaintiffs' Reasons for Failure to Exhaust

The plaintiffs point out that they did not simply fail to avail themselves of the internal procedures, but rather made mistakes while attempting to find their way through those procedures. See *Lewis,* 750 F.2d at 1380 (no attempt to utilize internal procedures); *Sosbe v. Delco Elecs. Div. of Gen. Motors Corp.,* 830 F.2d 83, 85 (7th Cir.1987) (same). It is not apparent, at least on the face of things, that the plaintiffs' mistake was unreasonable or inexcusable. The Union Constitution provides a two-path appellate procedure. It is not obvious that a grievant must elect only one path, nor is it obvious which path the plaintiffs should have chosen in this case. One path prescribed appeal from the Chairperson to the Committee. The other prescribed appeal of a constitutional matter to the President, and from a constitutional ruling made by the International President to the Board of Directors.

The plaintiffs also point out that G.C. Thompson responded to their petition addressed to the Committee (purportedly filed in an improper forum) without ever indicating that the plaintiffs had chosen the wrong path for their internal appeal. Nor did President DuBose, when the request was to him, plainly and explicitly indicate that he was making a constitutional interpretation. Nowhere in his letter to the plaintiffs does he even reference a particular article of the constitution.

Finally, the plaintiffs assert that the Union failed to demonstrate that the plaintiffs could have received relief through internal procedures that was substantially comparable to that afforded by a § 301 suit. The burden with respect to this matter is on the plaintiffs, however, not on the Union. *Lewis,* 750 F.2d at 1380–81 ("In a case involving failure to exhaust, the plaintiff has the burden of alleging facts showing that the intra-union procedures are inadequate under *Clayton.*"). Regardless of the burden, however, there is a dispute of fact here whether the internal union procedures can provide the plaintiffs with the relief they seek. *See Lewis,* 750 F.2d at 1381 (discussing the liberal pleading rules and the court's policy of determining actions on their merits).

The Union relies heavily on two pre-*Clayton* Seventh Circuit cases, *Newgent v. Modine Mfg. Co.,* 495 F.2d 919 (7th Cir.1974), and *Baldini v. Local Union 1095, United Auto. Workers,* 581 F.2d 145 (7th Cir.1978). These two cases indicated that a court in appropriate circumstances was obliged to require employees to exhaust internal union procedures before seeking relief in the courts. *Clayton* decided that courts have discretion to decide this issue. In fact, the Supreme Court in *Clayton* cited *Baldini* as indicating a conflict in the circuits, and the Court ultimately rejected the *Baldini* and *Newgent* reasoning. *Clayton,* 451 U.S. at 685 n. 6, n. 8, 101 S.Ct. at 2093 n. 6, n. 8. Since *Clayton* we have specifically overruled both cases on this very point. See *Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685, 690 n. 3 (7th Cir.1982) ("To the extent our holding on this point overrules this court's prior analyses of the exhaustion requirement in ... *Baldini v. Local Union 1095, UAW,* 581 F.2d 145 (7th Cir.1978); ... and *Newgent v. Modine Mfg. Co.,* 495 F.2d 919 (7th Cir.1974), this result is mandated by *Clayton.*"). The Union would be well advised to rely on the plentiful and

instructive precedent interpreting *Clayton* rather than on those cases that *Clayton* definitively overruled.

## V. Conclusion

Exhaustion is favored for those suits involving entirely intra-union issues. Under *Clayton*, however, exhaustion should not be automatically or woodenly applied. Instead, whether to require exhaustion of internal appeals procedures is a matter for the broad discretion of the court. That discretion is guided, but not limited, by the factors enunciated in *Clayton*. Thus a district court should carefully consider all of the appropriate bases for requiring or excusing the exhaustion requirement.

Fulk and Cearlock attempted to navigate their union's internal remedies. It is not abundantly clear that their efforts were unreasonable, nor that they are undeserving of relief from the exhaustion requirement. The Union's procedures are not a model of clarity. Discretion remains with the district court, but it must be fully exercised. We therefore VACATE the grant of summary judgment and REMAND for proceedings consistent with this opinion.