**Jesse FULK and Donald Cearlock, Plaintiffs,**

v.

**UNITED TRANSPORTATION UNION, Defendant.**

**No. 93–3278.**

United States District Court, C.D. Illinois, Springfield Division.

March 5, 1998.

James P. Baker, Springfield, IL, for Plaintiffs.

William K. Cavanagh, Springfield, IL, Kevin C. Brodar, Cleveland, OH, for Defendant.

## OPINION

RICHARD MILLS, District Judge.

The bottom line.

Summary judgment for the Union.

United Transportation Union (Union) represents operating craft employees of Norfolk Southern Railroad (Railroad). Jesse Fulk and Donald Cearlock are former employees of the Railroad and former members of the Union.

After much litigation—including two appeals to the U.S. Court of Appeals for the Seventh Circuit—only one issue remains in this case: Did the voting procedures used to decide whether to approve the Railroad's buyout of certain "productivity funds" violate the Union's Constitution?

## I. BACKGROUND

Here's what happened. The productivity funds at issue in this case were the product of a 1984 "crew consist" agreement between the Union and the Railroad. That agreement permitted the Railroad to reduce the operating crew size of each train from two brakemen and a conductor to one brakeman and a conductor as workers gradually left their jobs with the Railroad. In return, the Railroad agreed to share the resulting operating cost savings with the employees. Each time a train operated with a reduced crew, the Railroad paid $53.25 into a so-called "productivity fund" which was maintained for the benefit of the workers.

The Railroad maintained a separate productivity fund for each of several different geographical regions known as "seniority districts." The existence of these seniority districts predated the productivity fund arrangement. Only employees with seniority in a given district could work and receive payments from the productivity fund in that district. At the end of the year, the amount reflected in each productivity fund was totaled and divided among the workers in the fund's seniority district. The benefits of the funds varied greatly because the amount of work and the frequency of reduced crew usage varied across districts.

When the Railroad proposed to buy out the productivity funds in July 1991, the proposal came in conjunction with another proposed modification of the 1984 collective bargaining agreement. The Railroad wanted to further reduce operating crew sizes to only one worker. Assuming this proposal was approved by union membership, the Railroad was prepared to buy out its obligation to maintain the productivity funds. Under the terms of the buyout agreement, the Railroad

would pay each worker $20,000 up front and an additional $40,000 upon the worker's death, retirement, or termination of employment. The crew reduction proposal and the productivity fund buyout were presented to the union membership separately. The union membership would only have the option of approving the buyout if it approved the crew reduction.

The union leadership decided to employ a different voting procedure for each of the two proposals. The crew reduction proposal would stand or fall upon an aggregate vote of the entire union membership within certain subunits of the Union known as General Committees of Adjustment (GCAs). The GCAs covered geographic territories which were considerably larger than the seniority districts. Plaintiffs were members of GCA GO–719 which covered a territory known as the former Wabash Railroad territory and encompassed twelve different seniority districts. General Chairperson Kim Thompson headed GCA GO–719.

The voting procedure adopted for the productivity fund buyout proposal was markedly different. During negotiations, General Chairperson Thompson proposed, and the Railroad agreed, to allow each district the opportunity to approve or reject the proposed buyout of its productivity fund. This approach was justified by the fact that the value of each district's fund varied, as did the relative proportion of older employees to younger employees. Accordingly, the productivity fund buyout proposal would be voted on at the seniority district level, allowing union members in each of the twelve districts to decide whether or not to approve the buyout of its particular fund. The union membership in Plaintiffs' GCA were informed of the district by district voting procedure in advance of the voting date.

General Chairperson Thompson submitted the two proposals for a vote in late 1991. The crew reduction proposal was approved by the aggregate vote of GCA GO–719's membership. Predictably, the results of the district by district vote on the productivity fund buyout varied, each district reaching different conclusions about whether to retain or relinquish its productivity fund. Plaintiffs' district voted to retain its fund. Plaintiffs, who were near retirement, did not ex-

pect to enjoy much future benefit from their district's fund and therefore would have preferred to receive the $60,000 in buyout money.

## II. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment "should be granted if the pleadings and supporting documents show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Ruiz–Rivera v. Moyer,* 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Courts must consider evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

## III. ANALYSIS

Plaintiffs argue that the district by district vote on whether to approve the productivity fund buyout proposal violated Article 85 of the Union's constitution. That provision reads in part:

The General Chairperson must poll the entire membership holding seniority and working in the craft involved on the property by mail referendum ballot prior to signing any system agreements and be governed by the majority of the votes cast.

Plaintiffs argue that this language required the productivity fund buyout proposal to be decided by a single vote of all union membership within the GCA, with one result governing all twelve districts. In other words, Plaintiffs contend that the productivity fund buyout agreement should have been voted on in the same manner as the crew reduction agreement. Defendant disagrees.

The question turns purely on one's interpretation of Article 85. This court must

defer to the Union's interpretation of its own constitution so long as it is not unreasonable. *Maher v. Int'l Brotherhood of Electrical Workers*, 15 F.3d 711, 714 (7th Cir.1994). *See also Air Wisconsin Pilots Protection Committee v. Sanderson*, 909 F.2d 213, 218 (7th Cir.1990) (a union's interpretation of its own constitution must be "unreasonable, perhaps even 'patently unreasonable,' before we can set it aside"). The reason for this deference is to avoid "heavy-handed judicial interference" with the internal affairs of unions. *Air Wisconsin*, 909 F.2d at 218.

The Court cannot say that the Union's interpretation of Article 85 is unreasonable. On its face, the provision applies only to "system agreements." Plaintiffs point to no provision of any union instrument defining what system agreements are [1] but argue that the productivity fund buyout agreement is clearly one of them. They argue that the productivity fund buyout proposal must be a system agreement, because the original productivity fund arrangement "applied uniformly throughout the entire system." This argument is not very compelling. While the Railroad may have used the same formula to calculate its liability in different funds, the formula yielded widely divergent results because the factors determining those results (i.e., the frequency of reduced crew usage, etc.) varied widely across districts.

But Plaintiffs' position suffers from an even more fundamental flaw. According to Plaintiffs, Article 85 requires certain agreements, including this buyout agreement, to be put to a single system-wide vote leading to a single system-wide outcome for all districts. Plaintiffs fail to recognize, however, that the very terms of the buyout agreement permitted each district to decide the fate of its own fund. General Chairperson Thompson and the Railroad explicitly agreed to such a condition. In this sense, Plaintiffs should direct their complaints at the terms of the agreement itself, rather than the procedures adopted to vote on that agreement. In any case, it is difficult to see how the productivity fund agreement could possibly be a "system agreement" within the meaning of Article 85; if Article 85 requires a voting procedure which leads to a single outcome, it would be absurd to apply that provision to an agreement which itself presupposes the possibility of several different outcomes.

■ But even if the productivity fund buyout agreement is a "system agreement" within the meaning of Article 85, the language of that provision can reasonably be read to permit district by district voting in circumstances such as these. The language requires the General Chairperson to "poll the entire membership ... by mail referendum ballot prior to signing any system agreements and be governed by the majority of the votes cast." Here, there is no question that the General Chairperson polled the "entire membership." Nor is there any question that in each district his decision was "governed by a majority of votes cast." The only aspect of Article 85 supporting Plaintiffs' interpretation is the provision's use of the singular noun, "majority." While this drafting idiosyncrasy could be woodenly construed to require a voting procedure which entails only one majority and only one result, other reasonable interpretations exist. One could reasonably interpret Article 85 as requiring the General Chairperson to do no more than submit system agreements to some sort of majority vote in which every union member is allowed to participate.

Moreover, it is doubtful that the drafters of Article 85 intended it to apply as rigidly as Plaintiffs would apply it. Plaintiffs' interpretation would require the fate of all productivity funds to be decided in one fell swoop, even though the buyout price was not linked to individual fund values—values which varied drastically across districts. The Railroad did not insist that the buyout take place on an all or nothing basis and this Court can think of no reason why the drafters of the Union's constitution would have mandated such an inflexible result. The Union's constitution does not even mention productivity funds, and its authors probably never anticipated the kind of district-specific agreement

---

1. According to deposition testimony from General Chairperson Thompson, the term "system" applies to the area governed by a given GCA. The term "system agreement," therefore, probably refers to an agreement which contemplates some application throughout such a geographic area. Beyond this level of generality, however, the Court is without guidance.

at issue here. The Seventh Circuit has more than once refused to interfere with a union's decisions in reacting to such unanticipated situations, even where the language union's constitution seemed to afford less flexibility than the language at issue here. *See, e.g., Maher,* 15 F.3d at 714 (refusing to interfere with union officer's conclusion that a constitutional provision did not apply during a local union's trusteeship because the constitution did not address the issue of administering a trusteeship); *Air Wisconsin,* 909 F.2d at 217–218 (dismissing language in union policy statement and union constitution as "preambular" and refusing to apply it during airline merger when constitution did not even mention airline mergers). The Union's constitution is a "flexible instrument," and entrusts union officers with broad authority to protect the interests of union membership. *Allen v. United Transportation Union,* 964 F.2d 818, 820 (8th Cir.1992) (interpreting United Transportation Union's constitution); *Famulare v. United Transportation Union,* 639 F.Supp. 965, 969 (S.D.N.Y.1986) (same).

In conclusion, this Court must defer to the Union's interpretation of its constitution because that interpretation was not unreasonable. The Union, therefore, is entitled to summary judgment.

## CONCLUSION

*Ergo,* Defendant's motion for summary judgment [2] is ALLOWED.

---

2. Because of the procedural posture of this case, the Court ordered the parties to rebrief Defendant's original summary judgment motion. At that time, the original motion was nearly three years old. Rather than resurrecting this long-dead motion, the Court will treat Defendant's rebriefing as the new motion for summary judgment.