Jesse FULK and Donald Cearlock, Plaintiffs–Appellants,

v.

UNITED TRANSPORTATION UNION, Defendant–Appellee.

No. 98–1836.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1998.

Decided Nov. 12, 1998.

James P. Baker (argued), Springfield, IL, for Plaintiffs–Appellants.

William K. Cavanaugh, Cavanaugh & O'Hara, Springfield, IL, Kevin C. Brodar (argued), Cleveland, OH, for Defendant–Appellee.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

This case presents the question of whether the United Transportation Union (the "Union") violated its own constitution when it required, in addition to overall majority approval, that a majority of each district approve a proposed buyout plan in order for members in that district to participate. Plaintiffs Jesse Fulk and Donald Cearlock were employees of the Norfolk & Southern Railroad (the "Railroad") and members of the Union. Since their district failed to approve the buyout plan, the plaintiffs did not receive the payments that members from districts which approved the plan received. After unsuccessfully seeking internal union remedies,[1] plaintiffs sued the Union, alleging the voting procedure used was inherently discriminatory in violation of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a), and contrary to the Union's constitution in violation of § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, which provides a cause of action in such cases.

This is the third time this case has appeared before this Court. The first time, we reversed the district court's denial of summary judgment on the LMRDA claim, holding the voting procedure not to be inherently discriminatory. *Fulk v. United Transportation Union*, 81 F.3d 733 (7th Cir.1996). The second appeal concerned the district court's grant of summary judgment on the § 301 claim. We held the district court took an overly restrictive view of its discretion in whether to require exhaustion of union procedures before hearing the merits and remanded to the district court for further consideration. *Fulk v. United Transportation Union*, 108 F.3d 113 (7th Cir.1997). The district court then considered the merits of the plaintiffs' § 301 claim and granted summary judgment to the Union, holding that the voting procedure did not violate the Union's constitution. *Fulk v. United Transpor-*

---

1. Plaintiffs wrote a letter to International President DuBose challenging General Chairperson Thompson's decision on the voting procedures. President DuBose upheld the decision by letter. The plaintiffs then appealed to the General Committee of Adjustment, which took no action. Plaintiffs took their appeal to the Union's Board of Appeals, which determined that plaintiffs should have appealed President DuBose's letter to the Board of Directors and that plaintiffs were time-barred from pursuing such an appeal at that time.

*tation Union,* 995 F.Supp. 937 (C.D.Ill.1998). Plaintiffs appeal. We affirm.

## Background

As we explained in the previous two appeals, *Fulk,* 81 F.3d at 734–735, *Fulk,* 108 F.3d at 114–115, the Union represents certain workers employed by the Railroad. These workers are grouped by the Railroad into several geographic districts, known as "seniority districts." Plaintiffs were members of the Springfield [Illinois] District. The Union membership was also divided into several, considerably larger, geographical units, known as "General Committees of Adjustment" (GCAs), which in turn embraced several seniority districts.

This dispute arose when the Union brought up a proposed modification of its agreements with the Railroad for membership vote. The "crew consist agreement," covering conductors, brakemen and yardmen, governs the size of the crew used to operate each train. The original agreement, adopted in 1984, allowed the Railroad to reduce the crew size from two brakemen and a conductor to one brakeman and one conductor as workers retired or otherwise left the Railroad's employ. The Railroad agreed at that time to share the resulting cost savings with the workers. Whenever a train ran with only two crew members, the Railroad paid $53.25 into a "productivity fund," which was credited to the workers. A separate productivity fund was maintained for each seniority district. The amount paid into each fund depended on the number of trains in that particular district which had been operated with two-member crews.

The modifications disputed here were negotiated in 1991. The two modifications were: First, the "crew consist agreement" was to be changed to allow the Railroad to operate with one-person crews when the size of the work force within a particular seniority district permitted. Second, the productivity funds were to be eliminated. In their place, the Railroad would make a one-time payment in December 1991 of $20,000 to each employee and an additional payment of $40,000 to each employee upon death, retirement or termination of employment.

The union leadership decided to implement different voting procedures for each of the two proposals. The reduction in crew size was put to an aggregate vote of all members of a particular GCA. Votes were tallied within each craft (conductor, brakeman and yardman). Acceptance of the proposal by a majority of each craft's workers was required to pass the new crew consist agreement.

The union leadership took a different approach to the productivity fund buyout. The buyout was put to an independent vote in each seniority district, with the result in each district determining the fate of that district's productivity fund. The Union justified the district-by-district voting procedure by the fact that the value of the funds varied from district to district, as did the relative proportion of older workers to younger workers. Within each district, a majority of each craft was again required to approve the proposal.

In plaintiffs' GCA, the modification to the crew consist agreement was approved by nearly two-thirds of those voting in each craft. In the Springfield district, however, the productivity fund buyout proposal failed to carry a majority among brakemen. Hence plaintiffs were unable to participate in the productivity fund buyout. They complain that the district-by-district voting procedure for the productivity fund buyout violated the Union's constitution.

## Analysis

We review a district court's grant of summary judgment de novo, applying the same standards as the district court and viewing the record and all reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Independent Construction Equipment Builders Union v. Hyster–Yale Materials Handling,* 83 F.3d 930, 932 (7th Cir.1996).

█ This case concerns a dispute about the meaning of a union constitution. We defer to a union's interpretation of its own constitution so long as the interpretation is not unreasonable. *Maher v. International Brotherhood of Electrical Workers,* 15 F.3d 711, 714 (7th Cir.1994). "[A] union's interpretation of its own constitution, by-laws, and other promulgations is entitled to judicial

deference; we must be able to call the interpretation unreasonable, perhaps even 'patently unreasonable,' before we can set it aside." *Air Wisconsin Pilots Protection Committee v. Sanderson,* 909 F.2d 213, 218 (7th Cir.1990). This deference to a union's reasonable interpretation of its own constitution is predicated on a federal policy of non-interference in internal union affairs. *Local 657, United Brotherhood of Carpenters v. Sidell,* 552 F.2d 1250 (7th Cir.1977). Our question then in interpreting the Union's constitution is whether the Union's construction of its own constitution is a reasonable one.

At issue in this case is the interpretation of Article 85 of the Union's constitution. It reads:

> The General Chairperson must poll the entire membership holding seniority and working in the craft involved on the property by mail referendum ballot prior to signing any system agreements and be governed by the majority of the votes cast.

Plaintiffs contend that Article 85 required the Union to put the productivity fund buyout proposal to a simple majority vote before the entire union membership within each GCA. The Union argues that Article 85 imposed no such requirement.

The dispute between the Union and plaintiffs revolves around the meanings of "system agreement" and of "majority" in Article 85. The Union contends that the productivity fund buyout proposal was not a system agreement and hence not governed by Article 85's strictures. Alternatively, the Union argues that even if the proposal was a system agreement, Article 85 does not prohibit the Union from seeking majority approval within each district as well as within each GCA. Our question, as noted above, is whether the Union's interpretation is reasonable.

The phrase "system agreement" is not defined in the Union constitution. The only definition we have comes from the deposition testimony of General Chairperson Thompson, who testified that a "system agreement" is one which applies to the entire area of a GCA. Plaintiffs do not contest this definition, but contrast a "system agreement" with a "local agreement," and argue that since the

productivity fund buyout proposal was not a local agreement, it must be a system agreement. Plaintiffs buttress this argument by pointing to the method of ratification the Union chose in approving the proposal (submission to all members of the GCA) and the fact that the productivity fund buyout proposal replaced the productivity funds, which applied throughout the GCA.

The Union, by contrast, argues that the agreement was neither a "system agreement," nor a "local agreement," but a "hybrid agreement," incorporating elements of both. The "crew consist agreement" was more like a "system agreement," it argues, and the productivity fund buyout proposal resembled a "local agreement." Together these two proposals assuredly formed a "hybrid agreement." The Union therefore contends that if Article 85 does require a straight majority vote for system agreements (a proposition they dispute), it would either not apply to hybrid agreements or apply only to the "system agreement" component of a hybrid agreement, here, the "crew consist agreement," and not to the "local agreement" component which plaintiffs challenge.

The principal difficulty with plaintiffs' argument is that it rests on the premise that the Union can conclude only one of two types of agreements. Were we to agree with plaintiffs that the Union's constitution limits the kinds of agreements to these two types, it might be necessary to decide whether in fact the productivity fund buyout proposal was a "system agreement" (or allow a trier of fact to do so). However, plaintiffs point to no provision of the Union constitution which limits the Union to only two kinds of agreements, system and local, and bars so-called "hybrid agreements." Hence we cannot say that the Union's interpretation, allowing for "hybrid agreements," is unreasonable.

■ Even assuming that the productivity fund buyout proposal is in fact a system agreement, it is still not clear that plaintiffs would prevail. When seeking approval of system agreements, Article 85 imposes two duties on the General Chairperson: (1) to "poll the entire membership holding seniority and working in the craft" and (2) to "be

governed by the majority of the votes cast." Assuming the productivity fund buyout proposal was a system agreement, it is not clear that General Chairperson Thompson failed to comply with its strictures.

The Union argues that Thompson both polled the entire membership and was governed by a majority of the votes cast and thus complied with Article 85. While it is true that Thompson was not governed by the majority of the entire membership, the Union contends, but by majorities within each seniority district, nothing in Article 85 limits the General Chairperson to a single majority poll of the entire membership. Plaintiffs respond that "majority of the votes cast" can only reasonably be thought to modify "entire membership," and hence the voting procedures used in adopting a system agreement violated Article 85.

It is unnecessary to resolve which of the two readings of "majority" is the better one. Rather, we ask only whether the Union's interpretation is unreasonable. *Maher*, 15 F.3d at 714. Article 85 is ambiguous as to which majority must govern when the General Chairperson polls the entire membership. The value of the productivity fund buyout proposal to each district was a function of the value of the existing productivity funds, the age of the workers, and the number of reduced crews in each district. This value varied widely from district to district. In light of this variation, the Union allowed each district's participation in the plan to be governed by a majority vote within that district, rather than by a single majority vote across the entire membership. Article 85 does not plainly bar the Union's interpretation, and, in light of the district-by-district variation in value, it cannot be said that such an interpretation was unreasonable.

The district-by-district voting procedure for the fund buyout proposal did not violate Article 85 of the Union's constitution. The judgment of the district court is

AFFIRMED.