**Scott E. CARLSON, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, a corporation, and Bethlehem Steel Corporation, a corporation, Defendants.**

**No. 98 C 4774.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 24, 2000.

---

Robert Earl Harrington, Jr., Patrick Joseph Harrington, Harrington, Thompson, Acker & Harrington, Ltd., Chicago, IL, for Plaintiff.

Mark Clarke Fedota, Fedota, Childers & Rocca, P.C., Chicago, IL, George W. Gessler, Mark A. Pellegrino, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

MORAN, Senior District Judge.

Plaintiff Scott Carlson (Carlson) injured his ankle one rainy night in August 1996 while working as a switchman for defendant Consolidated Rail Corporation ("Conrail" or "the railroad") on property owned and controlled by defendant Bethlehem Steel Corporation ("Bethlehem Steel" or "the industry"). He filed this action under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, on August 3, 1998, alleging, *inter alia,* that Conrail negligently failed to provide him with reasonably safe working conditions, including a work area with uniform and properly tamped ballast, and adequate artificial illumination; that Bethlehem Steel similarly failed to maintain its premises in a reasonably safe condition for the work to be performed; and that Conrail violated its duty not to delegate the responsibility for furnishing Carlson with a safe place to work.[1]

On August 29, 1998, Conrail answered the complaint and filed a cross claim against Bethlehem Steel seeking indemnification pursuant to an "Agreement for Industry Track" (Agreement) between Bethlehem Steel and Penn Central Transportation Company, dated April 30, 1974. Penn Central was a predecessor of Conrail and all its rights under the Agreement were passed on to Conrail. The Agreement established the parties' respective duties and obligations regarding certain "Sidetrack facilities leading northwestwardly off the Buffalo–Chicago Main Line

---

1. Under FELA, 45 U.S.C. § 51, a railroad has the nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the railroad has no control. *See Shenker v. Baltimore & Ohio R.R. Co.,* 374 U.S. 1, 7, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963).

at Mile Post 485 + 529"' and terminating on industry property.

The cross claim here alleges that, pursuant to the terms of the Agreement, Conrail is entitled to recover from Bethlehem all of its defense costs in this litigation and, if Carlson should prevail, to indemnity "for the full amount of any sum CONRAIL may be adjudged liable to the plaintiff" (cc ¶ 10). We now have before us Conrail's motion for summary judgment on its cross claim. For the reasons discussed below, summary judgment is denied.

## I. Standards

On a motion for summary judgment we must view the record and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party—in this instance Bethlehem Steel. *Fulk v. United Transportation Union*, 160 F.3d 405, 407 (7th Cir.1998). Summary judgment is appropriate only if the evidence, read in this light, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II. Background

Carlson worked as a switchman at Bethlehem Steel's Burns Harbor Plant at least ten times before he was assigned the WDBH 62 position on a "regular" basis (Carlson dep. at 11–12). As "low man on the totem pole," he worked the third shift. He had not completed his first full week in this assignment before he was injured on the night of August 7, 1996.

At this stage of the litigation it is not clear precisely how Carlson injured his ankle or which of several factors contributed to his fall or to the injury. Piecing together details from Carlson's deposition and that of his supervisor, Michael King (King), it appears that Carlson slipped and fell while walking across the rail to throw the 631–632 lead. It was raining at the time, or had just rained, and the ties were wet (King dep. at 20). The oil that rises to the surface of the wood during warm weather and the creosote applied to protect the wooden ties from decaying made certain patches on the ties even more slippery when wet (Carlson dep. at 69). There was apparently little or no artificial light in the area. Prior to the accident Carlson made several oral complaints to various Conrail crew members and supervisors regarding the poor lighting conditions (*id.* at 98–99). No improvements were made, however, and that night, Carlson had to rely on his Conrail-issued hand-held lantern, which illuminated a circle approximately two to three feet in diameter.

Carlson testified that he slipped on a flat wooden surface. He attributed his fall to the fact that the tie "was wet, soaked with oil," and that there was no ballast around the tie. He testified that his left foot slipped off the left side of the railroad tie (*id.* at 70). Carlson's doctors told him he had an ankle sprain and torn ligaments (*id.* at 86).

After King was notified of the accident he went to the site to investigate. He wrote in his report that Carlson had "stepped on end of tie, ground surface two to three inches below top of ties, making for uneven surface." King elaborated in his deposition that in the area four or five ties adjacent to the switch, the ballast between the rails was two to three inches below the ties, thus creating an "uneven walking surface" (King dep. 20–26). He also speculated that Carlson's "lack of attention" as to where he was walking may also have contributed to the accident, or that perhaps Carlson had not sufficiently illuminated the area with his lantern. Ultimately, King conceded that he did not know what caused the accident.

Lower levels of ballast around rail ties would not always be deemed an "unsafe" or "improper" condition. King explained that "cribbing" is used to prevent blowing snow or debris from creating obstacles in the switch point area (*id.* at 34, 36). The

procedure involves removing four to five inches of ballast from between the ties within the switch point area to create holes or indentations where debris can settle out of harm's way. King, for one, did not believe that the accident site would have been cribbed because it was not within the switch point area. He also suggested that cribbing would not be done "on the end of the ties." For these reasons, Carlson would only have anticipated that the accident point was cribbed if he had been forewarned, according to King.

There is scant record evidence at this point regarding the parties' fulfillment of their respective duties to provide Carlson with reasonably safe working conditions. There was testimony that Midwest Construction has been hired to carry out track maintenance within the Bethlehem property and Conrail employees are not permitted entry onto industry property to inspect or maintain the rail (Carlson at 104; King dep. at 40). That would seem to be in some conflict with provisions of the Agreement, which defendants agree is still in full force and effect.

The relevant provisions of the Agreement include the following:

(1) *Right–of–Way*

The Industry shall provide . . . all necessary right-of-way outside the right-of-way of the Railroad, required for the proper construction and operation of said sidetrack, said right-of-way to be satisfactory to the Railroad. . . . The Railroad shall have the right to enter upon the property of the Industry, for the purpose of inspecting and operating said sidetrack.

(3) *Maintenance*

Said sidetrack shall be maintained (including removal of ice, snow, weeds and debris) and renewed to the satisfaction of the Railroad; the work shall be performed and the cost thereof borne as follows:

By the Railroad, at its expense, that portion on Railroad right of way.

By the Industry, at its expense, that portion beyond Railroad right of way.

(8) *Liability in Connection with Sidetrack*

. . .

(b) *Other Liability.*

Except as herein otherwise specifically provided, in respect . . . of injury to or death of persons, caused by or in connection with the construction, operation, maintenance, use, presence or removal of said side-track, as between the parties hereto;

(i) The Railroad shall assume responsibility for and hold the Industry harmless and defend the Industry from all losses (including claims for injuries to employees of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the actionable acts or omissions of the Railroad, its agents or employees, solely or in conjunction with a third person;

(ii) The Industry shall assume responsibility for and hold the Railroad harmless and defend the Railroad from all losses (including claims for injuries to employees of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the actionable acts or omissions of the Railroad, its agents or employe, solely or in conjunction with a third person;

(iii) The parties hereto shall equally bear all losses (including claims for injuries to employees of the Industry or of the Railroad), expenses, attorneys' fees, damages, claims and judgments arising from or growing out of the joint or concurring actionable acts or omissions of both parties hereto, their respective agents or employees

(iv) Notwithstanding anything contained in this Section 8(b), and irrespective of any joint or concurring negligence of the Railroad, the In-

dustry assumes sole responsibility for and agrees to indemnify, save harmless and defend the Railroad from and against all claims, actions or legal proceedings arising, in whole or in part, from (a) the failure of the Industry to comply with requirements set forth in Sections 3 and 7 hereof, or (b) any claims, actions or legal proceedings under [FELA], alleging or claiming, in legal effect, that the Railroad failed to correct or guard against an unsafe condition if the unsafe place to work or the condition resulted in whole or in part from any act or omission of the Industry, its agents, employees, tenants, licensees or invitees.

It is this last subparagraph, ¶ 8(b)(iv)(b), which is at the heart of the parties' dispute here.

## III.  *Analysis*

Conrail takes the position that the indemnification provision is unambiguous, that the conditions to trigger the provision are present in this lawsuit, and, therefore, that Conrail is entitled to judgment as a matter of law.  Bethlehem Steel believes, on the other hand, that the indemnification provision is dependent upon two factual preconditions which may or may not be present here, and Bethlehem Steel is entitled to have those facts determined by a jury. Although Conrail is correct that where the terms of the contract are not ambiguous, the meaning of the contract is a matter for the court to decide as a question of law, *Fort Wayne Cablevision v. Indiana & Michigan Electric Co.*, 443 N.E.2d 863, 866 (3rd Dist.Ind.1983), it is not correct that an unambiguous contract provision here entitles the railroad to summary judgment.

Bethlehem Steel makes four distinct, but related, arguments why summary judgment must be denied.  First, it argues that paragraph 8(b)(iv)(b) is only triggered if Bethlehem was in fact partly or wholly negligent.  It argues that the evidence does not show conclusively that the "place to work" or "condition" was "unsafe" or

"improper" as a matter of law and therefore summary judgment is premature. Second, and closely related, Bethlehem argues that there are disputed issues of fact concerning whether, if there was an "unsafe" condition, it resulted in whole or in part from any negligent act or omission of Bethlehem.

Third, Bethlehem argues that there is no undisputed evidence showing that Bethlehem's act or omission was, in whole or in part, the cause of the injury, and therefore Bethlehem is entitled to a factual determination by a jury regarding injury causation and the parties' fault.  And, finally, Bethlehem argues that because the complaint includes multiple claims against Conrail, the final provision is not automatically triggered, especially where the cause of the injury is not at all clear.

■  We think Bethlehem has it right. Under Conrail's interpretation, the site of the injury and the language of the employee's pleading would be determinative of whether the indemnification provision applied.  Conrail views the operative phrase as "alleging or claiming, in legal effect." It suggests that the preconditions for indemnification are present here:  paragraph 3 of count I of Carlson's complaint states that the claim is brought under FELA, and paragraph 6 alleges, in effect, that Conrail failed to "correct or guard against an unsafe condition."  Under this reading, one allegation in a FELA action that the unsafe place was due to an act or omission of the industry is all it takes to secure blanket protection from liability.

It is implausible, however, that the industry would agree to hitch its future legal liabilities to pleading decisions made by plaintiffs' lawyers.  Clearly, subparagraph 8(b)(iv)(b) requires a finding of an act or omission by Bethlehem that caused the "unsafe place to work or ... condition...."  The contract does not spell out the level of fault required, but it is explicit about causation.  It is not enough that railroad ties under Bethlehem's control are merely implicated in the accident.

Nor is the provision necessarily triggered even if there was an unsafe condition created by Bethlehem if the unsafe condition played no role in causing the accident. For example, hypothetically, if the ballast in the work area was improperly cribbed, but Carlson fell when the rubber sole on his lug boots detached, the mere existence of an unsafe but non-contributing condition caused by Bethlehem, will not trigger (b)(iv)(b). Indeed, if a jury were to find that acts or omissions by Conrail were solely responsible for the condition that caused the injury, despite the fact that it occurred on Bethlehem's property, subparagraph (b)(i) would apparently be triggered and Bethlehem Steel would be entitled to indemnification.

As this case reveals, a plaintiff's complaint will often allege multiple factors and conditions that led to an injury. Here, testimony implicates rain, oil, creosote, nightfall, the employee's carelessness, inadequate lighting (attributed at various points to all three parties), several parts of a railroad tie, falls in different directions, maintenance delegation to a third party, ballast conditions, improper and proper cribbing practice, notice and warnings, and an ulterior motive for the employee's absence from work. Under these circumstances it will not be clear whether provision 8(b)(iv)(b) applies until after a trier of fact has sorted out causation and fault. *Accord Laiho v. Consolidated Rail Corp.,* 4 F.Supp.2d 45 (D.Mass.1998); *D'Angelo v. Consolidated Rail Corp., Bethlehem Steel Corporation, and Midwest Construction Service, Inc.,* 2:97CV56 (N.D.Ind. June 29, 1999) (JM).

The only remaining question is whether the duty to defend is broader than the duty to indemnify and triggered prior to a finding of fact on the above issues. The court in *Laiho* considered and rejected this argument when made by Conrail with respect to an identical and contemporaneous indemnification clause. *See Laiho,* 4 F.Supp.2d at 51. We find it rather surprising that Conrail, the repeat player here, would cite to this District of Massachusetts case only with respect to the standards for summary judgment and without any argument to distinguish the result there, whether or not it was binding on this court.

■ In any case, given the specific language of the contract provision, we agree with the *Laiho* court that the duty to defend may not be determined as a matter of law prior to a finding that "the unsafe place to work or the condition resulted in whole or in part from any act or omission of the Industry." Here, the duty to defend must be read as *ex post facto* payment of defense costs.

The situation here is distinguishable from those cases finding an insurer's duty to defend independent of and broader than its duty to indemnify. *See, e.g., Wayne Tp. Bd. of School Com'rs v. Indiana Ins. Co.,* 650 N.E.2d 1205 (Ind.App.5th Dist. 1995) (insurer's duty to defend is determined from allegations of complaint and from those facts known to or ascertainable by insurer after reasonable investigation); *Western American Insurance Co. v. Moonlight Design Inc.,* 95 F.Supp.2d 838, 842 (N.D.Ill.2000) (under New York law, insurer must defend its insured unless there is no possible factual or legal basis that would bring the action within the purview of the policy, and must defend the entire action even if only one claim potentially falls within the coverage of the policy). The duty to defend in the insurance context, while grounded in the contract language, also follows from concerns about unequal bargaining power and contracts of adhesion. *See Cincinnati Ins. Co. v. Flanders Elec. Motor Service, Inc.,* 40 F.3d 146, 151, 39 ERC 1839 (7th Cir.1994) (under Indiana law, where language of insurance policy is ambiguous, *i.e.* "susceptible to more than one reasonable interpretation," the court must construe the language in favor of the insured). The defense incentives, moreover, are neatly lined up because the insurer wants to prevent a finding of all liability in order to avoid any payment under the policy.

Here, however, the four scenarios under the indemnification provision, ¶ (8)(b)(i)-(iv), reveal the likelihood of conflicting defense strategies between the two alleged tortfeasors. There is also no concern here regarding uneven bargaining power which would lead us to interpret an arguably ambiguous provision against the indemnified party. In this context, it is reasonable to interpret the term "duty to defend" to mean payment of defense costs once it is determined which indemnification provision will apply.

## CONCLUSION

For the foregoing reasons, summary judgment on the cross claim is denied.