**F I L E D**

PUBLISH

**AUG 27 2002**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

CARL L. JAMES; RANDY
DERRYBERRY; RALPH
SACCOMANNO; BRUCE GATES;
ALLEN BOWER; R. L. GARRISON;
UNION PACIFIC RAILROAD
COMPANY GENERAL COMMITTEE
OF ADJUSTMENT; JOHN DOES 1 -
286 WHOSE IDENTITIES ARE
CURRENTLY UNKNOWN,

        Plaintiffs-Appellants,

v.

INTERNATIONAL BROTHERHOOD
OF LOCOMOTIVE ENGINEERS, an
unincorporated labor organization,

        Defendant-Appellee.

No. 01-1257

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 00-Z-683)

---

Submitted on the briefs:

John R. Olsen of Olsen & Brown, L.L.C., Niwot, Colorado, for
Plaintiffs-Appellants.

Harold A. Ross of Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, and
Michael S. Wolly of Zwerdling, Paul, Leibig, Kahn & Wolly, P.C.,
Washington, D.C., for Defendant-Appellee.

Before **SEYMOUR** , **McKAY** , and **MURPHY** , Circuit Judges.

**SEYMOUR** , Circuit Judge

This case involves a dispute between a union that consolidated its internal structure and one of its local affiliates eliminated by that consolidation. The union constitution requires mergers of local affiliates to be approved by a "majority" of members from the "affected" affiliates. Union members voted overwhelmingly in favor of the consolidation undertaken here, but a majority of the plaintiffs' affiliate opposed it. Interpreting a "majority" to mean a majority of all votes cast, rather than a majority from within each local unit, the union implemented its proposal. Plaintiffs, whose local was dissolved and merged with another, filed this lawsuit asserting that the union's interpretation was unreasonable and that its actions therefore violated the union constitution and various of plaintiffs' rights. The district court granted summary judgment to the union. Plaintiffs appeal and we affirm. [1]

---

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

# I.

## FACTUAL BACKGROUND

The individual plaintiffs are locomotive engineers employed by the Union Pacific Railroad. Until 1996, they worked for the Denver & Rio Grande Western Railroad, a subsidiary of the Southern Pacific Railroad. The associational plaintiff, to which all of the individual plaintiffs belong, is the Union Pacific General Committee of Adjustment (the plaintiffs' committee). Based in Pueblo, Colorado, it is a subordinate entity of a larger railroad union. Until the events giving rise to this lawsuit, it was designated by its parent organization as the collective bargaining representative for its members.

Defendant is the parent union, the International Brotherhood of Locomotive Engineers (BLE), headquartered in Cleveland, Ohio. Founded in 1863, the BLE is North America's oldest railroad labor union. Once limited to locomotive engineers, its membership now includes other railroad employees and its total membership in the United States and Canada numbers 35,000.

The origins of this dispute lie in the 1996 merger between the Union Pacific Railroad and the Southern Pacific Railroad (including their subsidiary railroads), from which an expanded Union Pacific emerged as the surviving

railroad. [2]  Part of a trend toward greater consolidation in the railroad industry, the Union Pacific-Southern Pacific merger has spawned internal union conflict in a number of areas, including the determination of seniority status and the location of employee home terminals.  *See, e.g., Swonger v. Surface Transp. Bd.*, 265 F.3d 1135, 1137 (10th Cir.), *petition for cert. filed*, 70 U.S.L.W. 3444 (U.S. Dec. 18, 2001) (No. 01-93).  The current dispute stems from the union's decision to restructure its local affiliates that directly service workers on the newly enlarged Union Pacific, a move that eliminated several small general committees of adjustment across the western United States, including the plaintiffs' committee. These smaller committees were merged with others to form larger regional affiliates.

The general committees of adjustment, or GCA's as they are sometimes called, are a creation of the BLE constitution.  Their powers and duties are set forth in a section of the constitution entitled "Standing Rules," as are the conditions under which a new committee may be established.  The union contends

---

[2]      Railroad mergers must be approved by the Surface Transportation Board, the successor to the Interstate Commerce Commission.  Authorized to exempt the involved carriers from antitrust laws, the Board must find that the proposed merger is in the public interest and offers adequate protections to displaced railroad workers before it can approve the transaction.  49 U.S.C. §§ 11324-26. The Board approved the Union Pacific-Southern Pacific merger in August 1996, subject to a five-year oversight period.  *See Hagerman v. United Transp. Union*, 281 F.3d 1189, 1192 (10th Cir. 2002).

the primary purpose of a committee is to administer a collective bargaining agreement. [3] Aplee. Br. at 6. That contention is central to the union's position because the merger between Union Pacific and Southern Pacific eliminated several collective bargaining agreements, including the contract that formerly covered the members serviced by the plaintiffs' committee. Accordingly, the loss of these collective bargaining agreements sparked a struggle over the future role of the GCA's that administered them, including plaintiffs' committee.

Section 33 of the Standing Rules anticipates that a railroad merger may warrant the dissolution or consolidation of one or more committees. Under a heading entitled "Mergers, etc.," Section 33 states: "The committees involved on the merged [railroad] systems may be consolidated, if necessary, to meet the representational requirements of the membership." Section 33(a)(1)(B)-Standing Rules. (Section 33 of the Standing Rules is attached as an appendix to this opinion.) The rule requires a majority vote of the affected union membership to approve such a consolidation, and it sets out the terms and procedures that guide an election.

---

[3] The Standing Rules provide a GCA may be established "[o]n any system of railroad where two (2) or more divisions are organized" and on any subsidiary road or branch that "constitutes a separate department of the system . . . on which the BLE has separate and distinct schedules of pay . . ." Aplee. App. at 23.

As we discuss in detail below, the parties differ on a single issue: Which majority governs a consolidation election under the terms of Section 33? The union contends only a majority of the entire voting membership is required to approve consolidation, while plaintiffs maintain a majority from each committee must be obtained.

Before the merger between Union Pacific and Southern Pacific could win government approval, the union and the railroad were compelled to negotiate and adopt so-called "implementing agreements." One of the topics addressed by the implementing agreements was the replacement of existing collective bargaining agreements with newly-created agreements. Under the terms of these implementing agreements, the territory covered by the plaintiffs' committee, whose members worked for the then-existing Denver & Rio Grande Western Railroad, was split into two regions or "hubs": a Salt Lake City hub and a Denver hub. New collective bargaining agreements for each hub now cover employees from several of the merged railroads. These contracts replaced the contract formerly administered by the plaintiffs' committee. Union contracts covering other workers from the merged railroads were similarly affected.

As a result of these changes, the union had a greater number of committees than collective bargaining agreements. Then-BLE President Clarence Monin decided it might be desirable to consolidate the eleven committees serving the

-6-

enlarged Union Pacific to correspond with the consolidated union contracts. He directed union vice president Edward Dubroski to explore the issue. *Id.* at 663. In his resulting report, Dubroski recommended that while "in time . . . a case could be made in favor of consolidating committees," in the meantime the international should "continue to let the General chairmen work things out among themselves with our assistance." *Id.* at 664. In response, President Monin merely encouraged other committees to voluntarily consolidate, but with respect to plaintiffs' committee he effectively stripped it of jurisdiction over the applicable collective bargaining agreements by declaring a different committee the representative and agent of all members under the new agreements. *Id*. at 696-97.

The plaintiffs' committee appealed to the BLE Board of Appeals. It charged that the president's actions triggered Section 33 of the Standing Rules and therefore required a vote of the membership. [4] The Board of Appeals agreed, ruling that the president's unilateral move constituted an effort to force a committee merger and therefore "each member represented by an affected general committee [must] have a vote on whether or not the recommended consolidation/merger will take place." *Id.* at 697. The Board expressly refused to take a position on the "methodology" by which the election must be governed and

_____

[4]     The Board is authorized to review certain actions of the union president. *See* Section 44(a)(1)-Standing Rules, quoted in Aplee. Br. at 7 n.3.

therefore did not address whether a majority of all votes or a majority of each committee's membership was necessary to approve a merger of committees. *Id.*

Even before the Board of Appeals announced its decision, plaintiff James, chairman of the plaintiffs' committee, launched a nationwide campaign to recall President Monin. His efforts were successful. In 1999, the rank and file voted to remove Monin as BLE president. Union Vice-President Edward Dubroski succeeded his former boss on August 1, 1999.

Now-President Dubroski continued the effort to consolidate the Union Pacific committees. He convened a meeting of the chairs of all the committees to attempt to forge a voluntary agreement to consolidate, but the chairs, some of whom would have been forced to surrender their positions, were unable to reach a consensus. Dubroski also attempted to convince Union Pacific management, in the wake of the decision by the BLE Board of Appeals, to recognize plaintiff James as the bargaining agent of the employees he represented before the railroad merger. Union Pacific refused, asserting that the merger-related accords negotiated between the railroad and the union permitted only one representative for each collective bargaining agreement and that Union Pacific had recognized the chair of a different committee as the representative for James' members.

Dubroski next proposed consolidation in a letter sent directly to members:

> While no one likes change–it creates much pain–we simply have to restructure our general committees for reasons of economy,

> efficiency, sound business principles and effective representation. The maintenance of eleven (11) separate committees, or even more as some suggest, is too costly and would require increases in dues or even debt. Furthermore, the committees must be formed in a fashion that they can provide strong, adequate and unsplintered representation for all members within their geographic jurisdiction. Only through the changes recommended in my decision below could we be reasonably assured of a financially stable, healthy organization on Union Pacific that will meet the present and future needs of you, the members, in negotiating agreements and enforcing them.

Aplee. App. at 25. Dubroski proposed restructuring the existing eleven committees into six. Each new committee would cover a distinct geographic area, larger than any of the previous committees, and each would administer similar collective bargaining agreements within its territory. The letter also stated that a vote on consolidation would be conducted according to the process provided in Section 33(a)(1)B.

All eleven committees were, according to the language of Section 33, "affected" by the proposal, so ballots were sent to all BLE members on the Union Pacific system. An overall majority of members approved Dubroski's plan by a vote of 2,401 to 425. However, a majority of members covered by plaintiffs' general committee voted against the merger. With these results, Dubroski announced that the entire consolidation plan had been approved and would be implemented, thus eliminating plaintiffs' GCA.

Plaintiff James, on behalf of himself, his membership, and his committee, notified President Dubroski of his intent to appeal the results of the election,

contending that under Section 33 a committee cannot be dissolved and merged with another committee unless a majority from each committee consents. President Dubroski refused to submit the appeal to the BLE Board of Appeals, asserting that the Section 33 election result was not subject to appeal because Section 44 of the union constitution excepted actions taken under Section 33(a)(1) from the appeals process.

## II.

### DISTRICT COURT PROCEEDINGS AND STANDARDS OF REVIEW

After President Dubroski rejected their appeal, plaintiffs filed this lawsuit. The complaint alleged that the union's use of a straight majority vote to decide the outcome of the restructuring election was contrary to the process mandated by Section 33 of the union constitution, thereby violating the Railway Labor Act's duty of fair representation, *see* 45 U.S.C. § 152, and the union members' Bill of Rights set out in the Labor-Management Reporting and Disclosure Act, *see* 29 U.S.C. § 411. The complaint also alleged breach of contract and promissory estoppel under state law. Adopting a lengthy recommendation from the magistrate judge, the district court granted summary judgment in favor of the union on the federal labor claims and held the state law claims preempted by the Railway Labor Act.

We review de novo the district court's grant of summary judgment, which is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We review the evidence in the light most favorable to the nonmoving party, in this case plaintiffs. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998).

In this internal union dispute, two additional principles underpin our decision. The first is that judicial interference in intra-union affairs should be undertaken with great reluctance. *Lucas v. Bechtel Corp.*, 800 F.2d 839, 850 (9th Cir. 1986). Second, "[a]bsent bad faith or special circumstances, an interpretation of a union constitution by union officials . . . should not be disturbed by the court." *Teamsters Joint Council No. 42 v. Int'l Bhd. of Teamsters*, 82 F.3d 303, 306 (9th Cir. 1996) (quotation and citation omitted). These principles rest on a strong federal policy in favor of union self-governance. *See generally Local Union No. 657 of the United Bhd. of Carpenters v. Sidell*, 552 F.2d 1250, 1255-56 (7th Cir. 1977).

## III.

## THE DUTY OF FAIR REPRESENTATION

Plaintiffs charge that the union dissolved their committee and stripped its chairman of any authority to negotiate on their behalf with the railroad. They contend this conduct violated the union's internal constitution and breached the duty of fair representation.

The Supreme Court has recognized an implied duty of fair representation under the Railway Labor Act. *Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 202-07 (1944). This duty is breached when a union's conduct toward a member or group of members is "arbitrary, discriminatory, or in bad faith." *Rucker v. St. Louis Southwestern Ry. Co.*, 917 F.2d 1233, 1238 (10th Cir. 1990) (quotation and citation omitted). While the duty does not reach purely internal union affairs, it does extend to matters regarding a union's role as the collective bargaining agent for its members, including the negotiation, administration, and enforcement of collective bargaining agreements. *Distler v. United Mine Workers*, 711 F.2d 76, 79 (7th Cir. 1983).

The magistrate judge expressed some hesitance as to whether plaintiffs' claim implicates the duty of fair representation. We agree that the question is a close one because it involves internal union matters. But because the plaintiffs attack the voting procedures employed by the union, alleging that newly

-12-

formulated, unlawful procedures diluted their vote and deprived them of their designated bargaining representative, we conclude that their complaint is sufficient to state a claim for breach of the fair representation duty. [5]

Turning to the dispute, "[i]t is well settled that the relationship existing between a trade union and its members is contractual and that the constitution . . . constitute[s] a binding contract . . . ." *Adams v. Int'l Bhd. of Boilermakers,* 262 F.2d 835, 838 (10th Cir. 1959). The meaning of a provision in the union constitution must be viewed in light of the overriding "federal policy of noninterference in internal union affairs." *Fulk v. United Transp. Union*, 160 F.3d 405, 408 (7th Cir. 1998). "We defer to a union's interpretation of its own constitution so long as the interpretation is not unreasonable." *Id.* at 407. "[W]e must be able to call the interpretation unreasonable, perhaps even patently

---

[5] In light of our concerns, we sought and received supplemental briefing from the parties on this issue. As indicated, we are persuaded the plaintiffs did plead a justiciable claim because they allege that the union's voting procedures denied them fair representation. *See Steele*, 323 U.S. at 200 (implying a statutory duty of fair representation and noting that racially discriminatory membership rules "deprived" black railroad workers "of the right, which they would otherwise possess, to choose a representative of their own"); *see also Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 361 (D.C. Cir. 1999) (noting that "'the discriminatory denial of the right [to vote in contract ratification election] may be inconsistent with a union's [duty of fair representation].' *American Postal Workers Union, Local 6885 v. American Postal Workers Union, ('Postal Workers'),* 665 F. 2d 1096, 1105 n. 20 (D.C.Cir. 1981).")

unreasonable, before we can set it aside." *Id.* at 408 (quotation omitted). In addition, we regard the President's interpretation as the union's construction. [6]

Section 33(a)(1)-Standing Rules is part of the BLE constitution. The rule begins by requiring the union president, upon notice "that a merger [or] consolidation" in the railroad industry will occur, to "assign an officer for the purpose of directing the committees in the handling [of the matter] to the best interests of the members involved." *See* Section 33(a)(1). It continues by stating that committee consolidation may be necessary in response to a railroad merger, and sets out the procedures governing any such consolidation. *Id.* at (a)(1)(B). The relevant provisions read:

> The committees involved on the merged systems may be consolidated, if necessary, to meet the representational requirements of the membership.
>
> The officer assigned shall submit his recommendations to the International President. If the recommendation is to merge the involved committees, the International President shall forward said recommendation with all facts in support to the involved general committees. . . . . *If the decision of the majority is to merge the committees in question*, the International President shall notify the affected general committees of the decision and [arrange for the election of new officers]. . . . . *If it is the*

---

[6] The BLE constitution indicates that the union president's interpretation of the constitution is "the union's" interpretation: under a heading titled "Duties of the International President," section 7(b) of the constitution specifically grants the president the authority and responsibility to "render interpretations of the law of the BLE." Aplee. App. at 5.

> *decision of the majority not to merge their GCA's, their individual GCA's shall continue as heretofore.*

*Id.* (emphasis added). As we have said earlier, the parties read these words quite differently. The union interprets the phrase "of the majority" to mean a majority of the total votes cast. Plaintiffs argue "of the majority" refers to a majority of each separate committee.

The rule fails to identify unequivocally which majority shall control the outcome of the vote. We recognize our task is not to determine the true or correct meaning of Section 33 nor to decide which of the two competing readings of "majority" is the better one, but only to decide whether the union's interpretation is reasonable. *Laturner v. Burlington N., Inc.*, 501 F.2d 593, 599 (9th Cir. 1974). Our determination of reasonableness is a legal one. *See Lucas*, 800 F.2d at 850 ("The controversy before us is a legal one: was the IBEW's interpretation [of its constitution] reasonable and made in good faith?").

We conclude the union's interpretation of Section 33 is reasonable. The rule contains a syntactical clue suggesting that "the decision of the majority" refers to a majority of the voting membership as a whole. It states that "[i]f it is the decision of the majority not to merge *their* GCA's, *their* individual GCA's shall continue as heretofore." Section 33(a)(1)(B) (emphasis added). The use of the plural possessive pronoun ("their," as opposed to "its") undermines the notion that each separate committee retains a veto. It also points to a broader set of

-15-

relevant decision-makers, since "their GCA's" denotes the existence of at least two committees and suggests that the "majority" necessary to effect a decision "not to merge" comes from more than one committee's membership.

Moreover, there is no clear textual support for plaintiffs' interpretation of Section 33. This lack of support is particularly conspicuous in light of plaintiffs' earlier, unsuccessful attempt to amend the rule to align it with the interpretation they assert now. In late 1997, a local division of the BLE based, like the plaintiffs' committee, in Pueblo, Colorado, circulated a petition seeking support for an effort aimed at rewording Section 33. The proposed amendment would have made clear that "the committees involved may not be merged unless all of the involved committees agree," and would have eliminated some of the syntactical flaws discussed above. Aplee. App. at 127. For instance, the amended rule would have read: "If the decision of *each separate committee* is to merge the committees in question, [the merger shall proceed]. . . . If it is the decision of *one of the committees involved* is [sic] not to merge their GCA's, their individual GCA's shall continue as heretofore." *Id.* at 127-28. Plaintiff James sent these amendments to the chairmen of all BLE general committees, urging them to support "Division 29's efforts to insure that your members and ours have the final say in their destiny." *Id.* at 130. Section 33 was not amended, however,

failing to gain the currency necessary to be submitted to the rank and file for a vote.

Plaintiffs also point to what they call the legislative history of Section 33, claiming it reveals a clear intent to require majority approval from the membership of each committee before any such committee can be dissolved and merged with another. The record on which they rely comprises a history of the bitter relationship between small committees and the central union, much of it predating the enactment of Section 33. To the extent it is relevant, we are not convinced.

As an initial matter, plaintiffs lean heavily on comments made by delegates to the 1991 convention that drafted and ratified Section 33, comments like those made by Brother Chenchar, who said: "My members feel the International President shouldn't have the right to merge General Committees against their will." Aplt. App., vol. III at 442. Brother Myers expressed similar feelings: "Our divisions have felt the effect of a forced merger . . . and we are in favor of keeping the committee merge[r]s in the hands of the membership, not the International." *Id.* These remarks and others like them, cited extensively in plaintiffs' briefs, reveal no more than a desire to abolish the president's authority to force a merger without a vote of the membership. They are not inconsistent

with the union's actions here because they do not indicate conclusively the outcome of this internal debate.

In addition, the comments quoted above were directed not at Section 33 but at a different constitutional rule, what became Section 4(c) of the Standing Rules. *See id.* at 441. Under the dubious proposition that the legislative history of one provision illuminates another, plaintiffs call Section 4(c) a "related" rule. Yet Section 4(c) is significantly different from Section 33. Section 4(c) relates to the desire of "a General Committee of Adjustment on any *small* road or system" to merge with another committee against that committee's wishes. *Id.* (emphasis added). We are not confronted with a committee "on a small road or system," nor do we face a committee seeking to merge without the assent of the acquiring committee. Moreover, the meaning of Section 4(c) is more under-determined than that of Section 33; it says only that "[t]he final decision will rest with the affected members of the involved Committees." *Id.*

Plaintiffs also question whether resort to Section 33 was even appropriate, given the scale of the resulting changes. They assert that because the union intended to restructure its entire internal organization, the rule did not cover the election since it speaks not to a wholesale realignment but only to mergers of existing committees. We defer to the union's broad definition of the rule because it is neither unreasonable nor contrary to law or policy. The rule itself contains

-18-

no express limit on its scope, and it repeatedly calls its contemplated response to such a unique event a "consolidation." The plan approved by the union membership, it seems to us, represents a fairly typical, if extensive, "consolidation" plan. It reduces the number of existing committees, combines and enlarges geographic territories, and requires the election of officers to head the newly created committees, all in correspondence to the changes brought about by the underlying merger. The consolidation therefore appears to be reasonably within the scope of Section 33.

Our conclusion that the union reasonably interpreted Section 33 does not end our inquiry. Even if a union's action is authorized under its constitution, it may still breach the duty of fair representation. *Local No. 48, United Bhd. of Carpenters v. United Bhd. of Carpenters*, 920 F.2d 1047, 1053 (1st Cir. 1990). Thus, we still must determine, in light of the union's interpretation, whether the union breached the duty of fair representation, that is, whether its conduct was "arbitrary, discriminatory, or in bad faith." *Rucker*, 917 F.2d at 1238.

Given our belief that the union's interpretation of the rule was reasonable, we reject the argument that its conduct was arbitrary. Nor do we agree that the union discriminated against plaintiffs or singled-out their general committee. All BLE members on the Union Pacific, including the individual plaintiffs, were

given an equal vote, and four other committees in addition to plaintiffs' were eliminated as a result of the union's merger vote.

We likewise find no evidence of bad faith on the part of the union or any union official, despite plaintiffs' argument that the elimination of his committee through a membership vote was a continuation of the campaign plaintiffs allege former President Monin undertook against Mr. James and his committee for "being a thorn in the side of the International BLE." Aplt. App., vol. II at 178. To the extent that James himself has been an irritant, the person who bore the brunt of his offense was President Monin, whom James toppled in a successful recall election. There is no evidence of personal animus in this record between James and Monin's successor, Edward Dubroski, who called for and presided over the challenged election. The union contends its officials were motivated solely by the rational concern of how best to preserve the union's strength in the face of sweeping changes in the railroad industry, and plaintiffs have advanced little or no evidence to contradict this. Plaintiffs therefore fall short of the legal standard for establishing bad faith, which in this context requires evidence that "union officials acted contrary to the International's best interest, out of self-interest, or in an unconscionable or outrageous way." *Teamsters Joint Council No. 42*, 82 F.3d at 306.

In addition to its decision about which "majority" governs a Section 33 election, plaintiffs also allege that the union breached the duty of fair representation in two other respects. First, they claim that President Dubroski violated this duty by refusing to consider their internal administrative appeal. They rely on Section 44(a)(1)-Constitution, which provides that the BLE Board of Appeals "shall have authority to render a final and binding decision on all appeals from decisions and interpretations of the International President." Aplee. App. at 2. However, they ignore language in the rule that "excepts," among other things, decisions and interpretations arising under Section 33(a)(1) of the Standing Rules. *Id.* President Dubroski cited this language in rejecting plaintiffs' appeal. We cannot say his interpretation of the rule was unreasonable in light of Section 44's clear language. Nor can we say that his refusal to grant plaintiffs any other right of appeal was unreasonable.

Second, plaintiffs assert that President Dubroski's failure to include position statements from the general chairmen along with the ballots provided to the rank and file members and the fact that the International (Dubroski), rather than committee chairs, sent the ballots to affected members, violated the duty of fair representation. Plaintiffs are correct that Section 33(a)(1)(B) provides the general committees shall prepare the ballots and that the recommendations of committee chairs shall accompany the ballot along with the International's

-21-

recommendation. It is also undisputed that in this election the ballots and the International's recommendations were instead sent by the International and without recommendations of general committee chairs.

Defendants offer several reasons for these departures, including that some of the general committee chairs asked the International to distribute the ballot, general chairs could not agree on recommendations, and the International had distributed the ballots for previous mergers. Moreover, committee chairs were apparently still able to communicate their recommendations to members by doing so directly; plaintiffs have not asserted defendants attempted to prevent such contact in any way. There is also no evidence these departures were undertaken in a way that is arbitrary, discriminatory, or in bad faith. *Rucker*, 917 F.2d at 1238.

In light of the broad scale of the consolidation undertaken here and the ability of committee chairs to make their views known, we believe these departures from constitutional procedure are within the bounds of reasonableness as constrained by the deference we must give to a union's interpretation of its constitution and union conduct with regard to its own internal affairs. *Fulk*, 160 F.3d at 407-08. We conclude that although the election procedure departed somewhat from the strictures of Section 33, plaintiffs have not shown the union violated its duty of fair representation with these fairly minor derogations.

# IV.

## PLAINTIFFS' REMAINING CLAIMS

Relying on the same facts, as well as the same interpretation of the BLE constitution, plaintiffs contend the union's internal restructuring violated two provisions of the Labor Management Reporting and Disclosure Act. The first is Section 101(a)(1) of the Act, which grants union members "equal rights and privileges . . . to nominate candidates, to vote in elections or referendums . . ., to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings. . . ." 29 U.S.C. § 411(a)(1).

The magistrate judge rejected plaintiffs' claim, reasoning that any infringement of the statute "must be predicated on some form of discrimination." Aplt. App., vol. V at 831. The judge found that plaintiffs had failed to allege facts showing they were "treated differently than other union members with regard to their opportunity to vote on the recommended merger of General Committees." *Id.* at 832. She made the same finding with respect to the plaintiffs' right to pursue an administrative appeal of the merger. *Id.* The district court adopted these findings in full. We agree. The magistrate judge correctly interpreted the governing law and properly applied that law to the facts. *See Calhoon v. Harvey*, 379 U.S. 134, 138-39 (1964) (Section 101(a) is "no more than

-23-

a command that members and classes of members shall not be discriminated against in their right to nominate and vote.").

The district court, acting again on a recommendation from the magistrate judge, also was correct in rejecting plaintiffs' second claim under the Labor Management Reporting and Disclosure Act, this one resting on Section 101(a)(2) of the Act. That section protects union members' "right to meet and assemble freely with other members; and to express any views, arguments, or opinions." 29 U.S.C. § 411(a)(2). The record contains no evidence to support plaintiffs' claim under this statute.

Finally, the magistrate judge and the district court both ruled that plaintiffs' state law claims were preempted by the Railway Labor Act. Plaintiffs do not quarrel with this conclusion, and we therefore conclude they have waived their state law claims. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (failure to raise an issue in the opening brief waives the issue).

We AFFIRM the judgment of the United States District Court.

STANDING RULES

**Authority of International President in Mergers, etc.
with Protective Agreements**

Note: The term "Mergers, etc.," as referred to in subtitle and as hereinafter expressed in this section, means - mergers, consolidations, coordinations, control, absorptions, diversions of traffic, purchases or any other action whereby separate facilities or operations of railroads are going to be unified.

Section **33**.(a)(1) Mergers, etc.

When the International President has sufficient information that a merger, consolidation, coordination, control, absorption, diversion of traffic, purchase or any other action whereby separate facilities or operations of railroads are going to be unified, he shall immediately assign an officer for the purpose of directing the committees in the handling to the best interests of the members involved.

A.  Contracts

   A.    There shall be a revision of the existing agreements on the properties involved which will have for its purpose the consolidation of contracts covering the merged, etc. property.

   B.    The assigned officer, in conjunction with the interested general chairmen, shall represent all of the committees in negotiations with the carrier and/or carriers.

   C.    Contracts shall be ratified by a majority vote of the active members casing a ballot.

B.  General Committees

The committees involved on the merged systems may be consolidated, if necessary, to meet the representational requirements of the membership.

The officer assigned shall submit his recommendations to the International President.  If the recommendation is to merge the involved committees, the

International President shall forward said recommendation with all facts in support to the involved general committees. The affected general committee(s) shall refer the question to the membership under their jurisdiction by instructing each affected division to prepare a paper ballot to be delivered within sixty (60) days to each member of the division, by government mail, directed to his/her last known address. The ballot, with a large envelope, approximately 4 x 9 ½ inches, which must contain space for the member's name and address, must have first class postage affixed thereto and must contain the division number and address for returning the ballot. The ballot and return envelope must also be accompanied with the written recommendation of the International President, the written recommendation of the affected general chairmen, and written instructions showing purpose of the ballot, time, date and place for counting the ballots. The ballot shall also contain a signature and date line, which must be signed and dated by the member. The return envelope containing the ballot must be returned and postmarked within fifteen (15) days from the postmarked date on the envelope sent to the member. The ballots shall be counted by each division at the first regular division meeting following the date for return of the ballots. Each division secretary-treasurer will notify the general chairman of the results from the ballots received within ten (10) days. The affected general chairmen will forward this information to the International President and the other affected general chairmen within thirty (30) days from date received from last division reporting. If the decision of the majority is to merge the committees in question, the International President shall notify the affected general committees of the decision and instruct the merged committees to meet within ninety (90) days for the purpose of electing new officers, as provided in Section 9 - Standing Rules, and conducting any business or grievance that may properly come before the body. The new date to meet regularly shall be decided as per Section 8 - Standing Rules. If it is the decision of the majority not to merge their GCA's, their individual CGA's shall continue as heretofore.

C. Divisions

Representation

The general committee or general chairman and division or divisions affected shall, after the determination has been made relative to a merged seniority district or districts, make a study of the BLE divisions in the affected are for the purpose of reducing, if possible, the number thereof to only those necessary to maintain an efficient operation.

The general committee or general chairman and divisions affected shall give consideration to the following points as a guideline for making such a determination:

a.      The number of members in a division.

b.      The location of the majority of the member's place of residence.

c.      The availability of the majority of the members to attend the division meeting place.

d.      The location of the operating division offices nearest the BLE division.

Changes as referred to in the above paragraph shall not be put into effect by a general committee or general chairman until the proposed changes have been submitted to the Executive Committee of the ID and approved.

II.     Jurisdiction

Should it be, in the judgment of the general committee or general chairman and divisions affected, that more than one BLE division is necessary on a seniority district, and said BLE divisions have been set up, each division shall be given a definite territory by the general committee and/or the general chairman.

Elections to all offices of each division shall be held immediately after they have been set up, provided divisions have been merged or a new division has been created.

Should the GCA and divisions fail to reach an amicable agreement in the merging of and/or creating a new division within sixty (60) days, the matter shall be referred to the International President who shall, upon receipt thereof, make an investigation of the facts within thirty (30) days, after which the Executive Committee of the ID shall make a recommendation thereon, which shall be final and binding.