**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS
AND HELPERS, AFL-CIO,

      Plaintiff - Counterclaim Defendant,

v.

J. TOM BACA, officer capacity;
TIMOTHY SIMMONS, officer capacity;
ARNIE STADNICK, officer capacity,

      Defendants on Counterclaim, Third-
      Party Plaintiffs - Appellees,

v.

JOHN T. FULTZ, officer capacity,

      Third-Party Plaintiff - Appellee,

v.

NEWTON B. JONES,

      Third-Party Defendant - Appellant,

and

KATERYNA JONES; WILLIAM B.
CREEDEN,

      Third-Party Defendants.

No. 23-3225

_____

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP
BUILDERS, BLACKSMITHS, FORGERS
& HELPERS, AFL-CIO,

     Amicus Curiae.

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:23-CV-02250-EFM-TJJ)**

_____

Matthew B. Vianello, Jacobson Press P.C., Clayton, Missouri, for Third-Party Defendant-Appellant.

David A. Rosenfeld, Weinberg, Roger & Rosenfeld, Emeryville, California (Antonio Ruiz, Weinberg, Roger & Rosenfeld, Emeryville, California, and William T. Hanley, Los Angeles, California, with him on the briefs), for Third-Party Plaintiffs-Appellees.

Raymond Salva, Jr. and John B. Boyd, Boyd Kenter Thomas & Parrish, LLC, Independence, Missouri, filed a brief for Amicus Curiae the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL-CIO in support of Third-Party Plaintiffs-Appellees.

_____

Before **HARTZ**, **KELLY**, and **BACHARACH**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Newton Jones was the President of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (the Union), which represents tens of thousands of members in the United States and Canada. After determining that President Jones had pilfered Union funds, the Union's Executive Council, which is composed of the International President and five International Vice Presidents, removed

him from office and expelled him from the Union. Mr. Jones unsuccessfully challenged his disciplinary proceeding in the United States District Court for the District of Kansas. He now appeals the district court's summary judgment, contending that the disciplinary proceeding violated the Union Constitution and his due-process rights under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401–531. He also argues that the district court erred by denying him sufficient time to respond to the motion for summary judgment and not allowing him to engage in discovery. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's summary judgment.

The central issue in this appeal is whether the Executive Council violated the Union Constitution in removing President Jones from power. We defer to the Union in determining the meaning of its constitutional provisions. The difficulty here, however, is that former President Jones and the Executive Council disagree on what the Constitution requires, so we must resolve *who* speaks for the Union in this context. We decide that under this Constitution it is the Council, and that the Council's interpretations of the Constitution were not unreasonable. We conclude that Mr. Jones has not shown any violation of the Union Constitution or the LMRDA, or any error by the district court in conducting the summary-judgment proceedings.

## I.    BACKGROUND

In February 2023, Vice Presidents John Fultz, Timothy Simmons, Tom Baca, and Arnie Stadnick attended a Union meeting in Marco Island, Florida, where it was disclosed that the United States Department of Justice was investigating President Jones

and William Creeden, the Union's Secretary-Treasurer, for financial misconduct. President Jones allegedly admitted at the meeting that he had spent Union funds to travel to Ukraine with his wife. After returning from Marco Island, Vice President Simmons investigated the claims of financial misconduct and shared what he discovered with Vice Presidents Fultz, Baca, and Stadnick.

In April, Vice President Fultz brought disciplinary charges against President Jones. He alleged that President Jones had directed backpay to his wife while she had been living in Ukraine; that he had spent Union funds on private dining by his family; and that he had admitted on Marco Island that he had spent Union funds to travel to his residence in Ukraine.

Soon after receiving notice of the charges, President Jones created a committee to investigate the allegations. The committee members were Secretary-Treasurer Creeden, who had signed off on President Jones's questioned expenditures, and Vice President Lawrence McManamon.

On May 12 the five Vice Presidents held an Executive Council meeting. Vice President McManamon opposed the gathering, saying that it was not an official meeting of the Council. But with Vice President McManamon abstaining and Vice President Fultz recusing himself, the three remaining Council members voted to disqualify President Jones from performing any presidential role in processing the charges against him. Reading the Union Constitution to give the Council exclusive authority to hear the charges and determine how to proceed, those three Council members also appointed

Robert Lunsford, Business Manager of Union District 57, to perform the duties of President in processing the charges.

On May 16 Mr. Lunsford notified President Jones and the Vice Presidents that the hearing would take place on May 30. On that date, Vice Presidents Baca, Simmons, and Stadnick served as the tribunal. Neither President Jones nor Vice President McManamon attended.

Vice President Fultz presented evidence that President Jones had paid his wife over $100,000 in Union funds while she was living in Ukraine, for work she never performed. He also produced credit-card statements showing that President Jones had spent roughly $40,000 in Union funds on meals for himself and his wife near his home in North Carolina, and had spent over $20,000 for flights by him and his wife to visit his second home in Ukraine. A few days later, on June 2, the three voting Vice Presidents issued a written Executive Council decision finding that President Jones had violated the Union Constitution, removing him from office, stripping him of his Union membership, and directing him to pay back all the money he misspent.

President Jones refused to step down. Instead, he removed from various Union positions the Vice Presidents who had acted against him, filed charges against them, and limited their travel. And purporting to act on behalf of the Union, he filed this lawsuit in the United States District Court for the District of Kansas, seeking to nullify the Vice Presidents' June 2 decision and prohibit further action against him as Union President. *See Int'l Brotherhood of Boilermakers v. Baca*, No. 23-2250-EFM-TJJ, 2023 WL 5334626, at *2 (D. Kan. Aug. 18, 2023). The three Vice Presidents who issued the June 2

Page 5

decision, joined by Vice President Fultz, then brought counterclaims under federal labor law against President Jones, his wife, and Secretary-Treasurer Creeden for breach of the Union Constitution, retaliation, and breach of fiduciary duty. They also sought a temporary restraining order or a preliminary injunction removing President Jones from office while the case was pending.

On June 20 the district court held a hearing to decide the competing motions. Because the central issue was determining *who* controlled the Union—the President or the Executive Council—the court declared that the Union itself could not take sides and therefore forbade the Union's counsel from arguing for President Jones's interpretation of the Union Constitution. The court then continued the hearing until President Jones could obtain counsel.

Two days later the district court issued an "interim preliminary injunction" in accordance with an agreement reached by the parties, keeping President Jones in office but preventing him from traveling or using his credit cards without the Vice Presidents' approval. *Id.* at *3. Soon after, Mr. Jones, his wife, and Mr. Creeden obtained counsel and filed answers to the counterclaims. Then the Vice Presidents filed a "Notice of Failure to File Opposition," pointing out that Mr. Jones had not responded to their motion for an injunction, and claiming that after the June 20 hearing Mr. Jones, his wife, and Mr. Creeden had paid themselves over half-a-million dollars for unused vacation time. *Id.*

On July 27 the district court held a hearing on the Vice Presidents' motion for a preliminary injunction. But on July 31, before the court issued its ruling, Mr. Jones sent a letter to "All Principal Lodge Officers" announcing his immediate retirement, appointing

his successor, and bemoaning the "ugly . . . smear campaign against me and my wonderful wife." Aplt. App., Vol. III at 213–14. The next day the court denied the Vice Presidents' motion and set an expedited summary-judgment schedule.

On August 18 the district court granted the Vice Presidents partial summary judgment on Count I of their counterclaim, affirming their decision to remove Mr. Jones from office. (Counts II and III claimed retaliation and misappropriation of funds in breach of fiduciary duties.) The court ruled that the Executive Council's decision was "binding and entitled to full effect." *Baca*, 2023 WL 5334626, at *4.

Mr. Jones filed a notice of appeal challenging the partial summary judgment. We took jurisdiction of this appeal after the district court granted his motion for entry of final judgment under Fed. R. Civ. P. 54(b).

## II.    DISCUSSION

### A.    Standard of Review

"We review de novo the district court's grant of summary judgment, applying the same legal standards that govern the district court." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1249 (10th Cir. 2020). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B.    Procedural Objections under the Union Constitution

#### 1.    Disqualifying President Jones and Rejecting his Investigatory Committee

On May 12 the Executive Council disqualified President Jones from using presidential authority to process his own disciplinary charges, thus rejecting his investigatory committee. Mr. Jones challenges this action as improper under the Union Constitution. He points to Article 7.1.1, which provides that "[t]he International President shall be empowered to designate any member of the International Brotherhood to perform any of the duties of the International President's office." And he argues that one of those duties was "appointing a hearing officer or panel to conduct a hearing." Aplt. Br. at 48. The Vice Presidents in turn point to Article 17.3.2, which states that "[t]he Executive Council shall have exclusive jurisdiction to hear charges against . . . International Officers," and which forbids participation in such proceedings by "[a]ny member of the Executive Council who is directly involved in the proceedings so that the Council member cannot function in an impartial manner."[1]

---

[1] Article 17.3.2 provides in full:

The Executive Council shall have jurisdiction to hear charges of violations of this Constitution by any member or subordinate body of the International Brotherhood if in the judgment of the International President the circumstances warrant. It can exercise such jurisdiction even though charges are pending before a Local Lodge. The Executive Council shall have exclusive jurisdiction to hear charges against subordinate bodies and against International Officers. Any member of the Executive Council who is directly involved in the proceedings so that the Council member cannot function in an impartial manner shall not participate in the proceedings or be subject to challenge for cause.

In our view, the language of the Constitution favors the position of the Vice Presidents. But our view is of only limited value in this context. In light of the "strong federal policy in favor of union self-governance," this court has recognized that "judicial interference in intra-union affairs should be undertaken with great reluctance." *James v. Int'l Brotherhood of Locomotive Eng'rs*, 302 F.3d 1139, 1145 (10th Cir. 2002). Consequently, "[w]e defer to a union's interpretation of its own constitution so long as the interpretation is not unreasonable." *Id.* at 1146 (internal quotation marks omitted). The issue here, however, is that each party—the President, and the Vice Presidents acting as the Executive Council—invoked the provisions of the Union Constitution in support of its position and claims that its interpretation was that of the Union. Thus, we must decide who speaks for the Union in this controversy.

We conclude that we must defer to the interpretations of the Executive Council. For one thing, Article 17.3.2, entitled "Executive Council Jurisdiction," states that the Council "shall have exclusive jurisdiction to hear charges against . . . International Officers." The President is an "International Officer." IBB Const. art. 4.1. This exclusivity suggests that all decisions in such proceedings, which necessarily entail interpreting the relevant Union law, are left to the Council.

Perhaps more importantly, the Union Constitution places the Executive Council above the President in the Union decision-making hierarchy. Article 1.5, entitled "Vesting of Powers," states: "When the International Brotherhood is not in Convention session, its executive and judicial powers only shall be vested in . . . the Executive Council." (internal quotation marks omitted). A quintessential component of "judicial

Page 9

powers" is the interpretation of laws. To be sure, Article 7.2, relied on by Mr. Jones, provides that "[t]he International President shall hear and decide all questions involving interpretation or application of this Constitution." But that language is immediately followed by language establishing that the Executive Council has superior authority: "All decisions shall be binding unless reversed or modified by the Executive Council upon proper appeal." IBB Const. art. 7.2. We recognize, as Mr. Jones points out, that there was no appeal from his decisions regarding how to proceed on the claims against him. But the present dispute would not lend itself to a typical appeal within the Union machinery. What we have is a battle of competing decisions by two different units within the Union: President Jones made one decision and the Executive Council made a contrary decision. In our view, under the Union Constitution primacy belongs to the unit with higher constitutional authority on such matters. And that is the Executive Council, because the Constitution vests judicial power in that body when the Union is not in Convention session and because it can override (in the appeal process) a constitutional interpretation by the Union President. *Cf. Exec. Bd. of Transp. Workers Union of Phila., Loc. 234 v. Transp. Workers Union of Am.*, 338 F.3d 166, 171–72 (3d Cir. 2003) (concluding that the executive council's interpretation of a union constitution was the union's interpretation— even though the president was empowered to "interpret the meaning and application" of the constitution—because the executive council "served as the final step in the internal union appeals process" (internal quotation marks omitted)).

Mr. Jones nevertheless declares that a contrary result is compelled by our decision in *James*, where we said that "we regard the President's interpretation as the union's

construction." 302 F.3d at 1146. In that case, however, there was no indication that any other union component could set aside the president's interpretation. *See James*, 302 F.3d at 1144–46 & n.6. The union president was the only candidate to offer "the union's" interpretation. *Id.* at 1146. Hence, we had no occasion to resolve a dispute about the distribution of power within that union. Presented with a different union constitution, apparently with substantially different provisions, and now considering the question squarely, we reach a different result.

The issue therefore becomes only whether the interpretations by the Executive Council were unreasonable. We have no hesitation in saying that the Council was not unreasonable in deciding that President Jones was barred by the Union Constitution from performing any role in the proceedings against him. We therefore agree with the district court in affirming the Council's June 2 decision interpreting Article 17.3.2 to give it exclusive jurisdiction over the proceedings against President Jones.

### 2.    Appointing Mr. Lunsford

Relatedly, Mr. Jones argues that the Executive Council had no authority to appoint a "temporary, partially-empowered International President" at its May 12 meeting. Aplt. Br. at 51. We are not persuaded. Because Article 17.2.2 gives the President the responsibility to set hearing dates and provide notice to the parties—but Article 17.3.2 forbade President Jones from "participat[ing] in the proceedings"—the Council appointed Mr. Lunsford to perform the President's "role" in processing the charges against President Jones. Aplt. App., Vol. I at 158. In other words, the Council appointed Mr. Lunsford to perform tasks that it believed President Jones was disqualified from

Page 11

performing. This decision makes common sense: The President is obviously "directly involved" in proceedings to oust him and therefore is barred from participating in the proceedings by Article 17.3.2. By the same token, he should not be permitted to participate by proxies whom he appoints. And the obvious body to appoint his replacement in that regard is the Executive Council. This approach finds considerable support in Article 4.5, which states that "in the event of a vacancy in the office of International President[,] such vacancy shall be filled for the balance of the term by majority vote of the Executive Council." Given that the Council was required to fill vacancies in the President's office, it was logical for it to fill a "partial" vacancy resulting from a President's disqualification from performing a portion of his normal functions. Because the Council's interpretation was a reasonable means of effectuating the provisions of the Union Constitution, we see no error in the district court's affirmance of the Lunsford appointment.

### 3.     Holding the May 12 Meeting

Article 5.8 of the Union Constitution provides: "The Executive Council shall meet on call of the International President as conditions warrant, but shall meet at least semi-annually, and shall meet immediately preceding and following each Convention." Focusing on the first part of that sentence, Mr. Jones argues that the Council's May 12 meeting was "unauthorized" in the first place, because only he had the power to call it. Aplt. Br. at 45.

We think this is a strained construction of the sentence. To begin with, after stating that the President can call a meeting of the Council as needed, the sentence continues

"but [it] shall meet at least semi-annually." IBB Const. art. 5.8 The use of the word *but* conveys that even if the President does not call meetings, the Council still needs to meet at least twice a year, thereby clearly contemplating meetings not called by the President. Further, by Mr. Jones's logic, the Council might be prevented from taking any action against a corrupt President until the next Convention (which would be in 2026 under Article 2.1), because the President could refuse to call a meeting. The Council's implicit interpretation of the Constitution—that it was allowed to meet without the President's call—was not unreasonable, so we defer to it. *See Int'l Union of Journeymen Horseshoers & Allied Trades v. AFL-CIO*, No. 03CV6070 (ARR)(KAM), 2004 WL 3362704, at *14 n.19 (E.D.N.Y. Aug. 9, 2004) (explaining that a union's implicit determination that a constitutional provision did not apply "was unquestionably an interpretation of the constitution") (citing *Sim v. N.Y. Mailers' Union No. 6*, 166 F.3d 465, 470–71 (2d Cir. 1999), as an example of judicial deference "to the union's interpretation of its governing documents in defending the legality of its conduct in the litigation"); *see also Fulk v. United Transp. Union*, 160 F.3d 405, 408 (7th Cir. 1998) (concluding that a union's construction of its own constitution "is a reasonable one," without referencing whether the union explicitly adopted that construction before the litigation); *Allen v. United Transp. Union*, 964 F.2d 818, 821 (8th Cir. 1992) (same).

### 4.     Notifying President Jones of the Disciplinary Hearing

On May 16 Mr. Lunsford notified President Jones that his hearing would take place on May 30 (14 days later). Article 17.2.2 specifies, however, that the President "shall give the accused at least fifteen (15) days['] notice of the time and place of a

hearing on such charge at which such accused shall appear and defend." Thus, the notice was one day short.

The Vice Presidents do not dispute the arithmetic; instead, they argue that Mr. Jones has not shown any resulting prejudice. And Mr. Jones does not say otherwise. Indeed, he did not request a postponement and chose not to attend the hearing. We decline to disturb the Union's ultimate decision because of an inconsequential scheduling error. *See Int'l Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 245 (1971) (in rejecting claim of inadequate notice of the substance of the charges, the Court said, "Respondent does not suggest, and we cannot discern, any possibility of prejudice."); *Vars v. Int'l Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers*, 215 F. Supp. 943, 948 (D. Conn.), *aff'd*, 320 F.2d 576 (2d Cir. 1963) (rejecting a union member's claim that he received insufficient notice of a hearing—14 days rather than the required 15 days—because he never "claimed that the one-day variance in his receipt of the notice actually prejudiced the preparation of his defense").[2]

---

[2] Mr. Jones also argues on appeal that he should have been given the 15 days' notice only *after* an informal hearing had been held; but he does not cite to where he made that argument in district court. He cites only to the Union's First Amended Complaint, Aplt. App., Vol. I at 29–30 (which does not make this argument), and the Vice Presidents' Statement of Undisputed Material Facts in support of their summary-judgment motion, Aplt. App., Vol. III at 188 (which just quotes the IBB Constitution). Because he did not raise this argument before the district court, we consider it forfeited, and because he does not argue for plain-error review, we decline to address it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127–31 (10th Cir. 2011).

### 5.      Quorum

The parties agree that the Executive Council was required to have a quorum at its May 30 disciplinary hearing before it could vote to remove President Jones from office. Article 5.8 defines a *quorum* as a "[a] majority of the Council." Because the Council had six members—the President plus five Vice Presidents—four members were necessary for a quorum. Four Council members attended the May 30 hearing, but one of the four, Vice President Fultz, properly recused himself from voting because he presented the evidence against President Jones.

We must therefore address whether Vice President Fultz counted for quorum purposes. Mr. Jones asserts that Vice President Fultz's recusal made him "ineligible to help reach the necessary quorum," so there was no quorum and the Council's decision to remove him had "no binding effect." Aplt. Br. at 56 (internal quotation marks omitted). He relies on *New Process Steel, L.P. v. NLRB*, where the Supreme Court analyzed the National Labor Relations Board's group quorum requirement and stated that "[a] quorum is the number of members of a larger body that must participate for the valid transaction of business." 560 U.S. 674, 683–84 (2010). Seizing on the word *participate*, Mr. Jones argues that Vice President Fultz did not "participate" in the vote to remove him, so he did not count toward a quorum.

*New Process Steel* is inapposite. The Supreme Court was considering a technical matter of statutory interpretation and had no need to expound on the general notion of quorum. In particular, nothing in that case turned on whether a member of the NLRB *participated* in a case; rather, the issue turned on how many people were actually

members of that Board. The question before the Court was whether, after the Board delegated its powers to a group of three Board members, "two members may continue to exercise that delegated authority once the group's (and the Board's) membership falls to two." *Id.* at 676. The Court concluded the answer was no; a delegee group must "*maintain* a membership of three." *Id.* at 683 (emphasis added). It reasoned, in part, that there was no "convincing evidence" that Congress intended to authorize the Board's "Rube Goldberg-style delegation mechanism": "delegating to a group of three, allowing a term to expire, and then continuing with a two-member quorum of a phantom delegee group." *Id.* at 682. That is hardly the situation we face here. The Executive Council "maintain[ed]" all six of its members. *Id.* at 683.

The Vice Presidents argue that Vice President Fultz counted toward the quorum because he was "present"—he was not required to "participate." Aplee. Br. at 38–39. This view finds support in the Union Constitution's incorporation of Robert's Rules of Order. *See* IBB Const. art. 34.12 ("Except as otherwise provided in this Constitution . . ., Robert's Rules of Order shall be the parliamentary law for the International Brotherhood and its subordinate bodies respectively."). Robert's Rules of Order requires only that a member be "present" to count toward a quorum. *See* Robert's Rules of Order Newly Revised § 40:1 (12th ed. 2020) ("a quorum in an assembly is the number of members . . . who must be *present* in order that business can be validly transacted. The quorum refers to the *number of members present, not to the number actually voting on a particular question*." (emphasis added)). Because Vice President Fultz was "present" at the

disciplinary hearing, he counted toward the quorum. That he did not "actually vot[e]" to remove President Jones from office was immaterial. *Id.*

Given the definition of *quorum* in Robert's Rules of Order, we conclude that the Council's implicit interpretation was not unreasonable. The district court did not err in affirming the presence of a quorum.

### 6.     Majority Vote

Mr. Jones argues that the Executive Council did not remove him from office by "majority vote" as required by Article 5.8 of the Union Constitution. He asserts that a "majority vote" requires a majority of the *Council*—that is, at least four of its six members—but only three members voted to remove him. The Vice Presidents respond that a "majority vote" refers to a majority of the *quorum*. Their response is correct. "[T]he general rule of all parliamentary bodies is that, when a quorum is present, the act of a majority of the quorum is the act of the body. This has been the rule for all time, except so far as in any given case the terms of the organic act under which the body is assembled have prescribed specific limitations." *United States v. Ballin*, 144 U.S. 1, 6 (1892). Any other rule would be nonsensical. The very notion of a quorum is to enable a parliamentary body to act with a majority of those present. Under Mr. Jones's rule there would be no point in stating what constitutes a quorum because official action would require a majority of all members in every case. No deference is necessary to affirm this Union interpretation.

### B.     Procedural Objections Under the LMRDA

Mr. Jones also argues that the Executive Council violated his due-process rights under the Labor-Management Reporting and Disclosure Act (LMRDA). Under 29 U.S.C. § 411(a)(5), union members are protected by the following "[s]afeguards against improper disciplinary action":

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Mr. Jones complains that the charges against him were too vague, the Vice Presidents who voted to remove him were biased, and he was not allowed to review and rebut the evidence against him.

To begin with, we doubt that § 411(a) applies in this case. It appears to be settled law that the statute does not apply to union proceedings to oust union leaders from office. *See Finnegan v. Leu*, 456 U.S. 431, 436–37 (1982) ("It is readily apparent, both from the language of these [LMRDA] provisions and from the legislative history of Title I [of the LMRDA], that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect." (footnote omitted)); *Grand Lodge of Int'l Ass'n of Machinists v. King*, 335 F.2d 340, 342 (9th Cir. 1964) ("In deference to the 'patent legislative intent,' it has been held with virtual unanimity that [29 U.S.C. § 411(a)(5)] does not apply to removal or suspension from union office." (footnotes omitted)).

The statute does, however, apply when a "member" is "expelled" from a union. 29 U.S.C. § 411(a)(5). Thus, a union officer "'may recover under § 411(a)(5) . . . to the extent that his membership rights were affected by the union disciplinary proceeding.'" *Gesink v. Grand Lodge, Int'l Ass'n of Machinists & Aerospace Workers*, 831 F.2d 214, 217 (10th Cir. 1987) (quoting and adopting, as "correctly set[ting] forth the controlling principles of law," the district court's opinion). Here, the Executive Council removed Mr. Jones not only from his office but also from his membership. But as best we can tell, the declaratory judgment challenged in this appeal did not address Mr. Jones's membership. We might therefore decline to consider his arguments. In the interest of caution, however, we will review his procedural objections under the LMRDA.

Because these objections are meritless, we reject them.

### 1.    Vagueness

Vice President Fultz charged President Jones with the following violations of Article 17.1.7's prohibition on "[m]ishandling, misappropriating, or otherwise misusing union funds or properties":

- In 2015, you directed back pay to be paid to your spouse, while your spouse was not living in the United States.
- Expenditure of union funds for meals for yourself, your spouse and other family members when at your home location.
- On February 26, 2023, in Marco Island, in a meeting with the International Executive Council, legal counsel (David Elbaor, Jason McClitis, and Michael Stapp) and others in attendance, you admitted expenditure of union funds to travel to your residence in the Ukraine.

Aplt. App., Vol. I at 149.

Arguing that these charges were not specific enough, Mr. Jones relies on *Gleason v. Chain Service Restaurant*, 422 F.2d 342, 343 (2d Cir. 1970). That decision is readily distinguishable. There, the accused was charged with collecting money from other members "as dues and initiation fees and failing to turn it over to the union treasury." *Id.* The only further specific allegations were that the events "took place during 1965, 1966, and 1967"; that "employees of the Walgreen company" were involved; that "at least twice in 1965 Gleason did not turn over $30 initiation fees"; and that "on several occasions, no date specified, he retained the $10 dues." *Id.* Mr. Jones asserts that the charges against him are similarly lacking in detail.

We disagree. To prepare a defense, Gleason would have needed to rack his memory over interactions with union members, especially with the Walgreen Company, during a three-year period, involving transactions of only $10 or $30 in which someone might think he was pocketing money that should have gone to the union. If guilty, he might well have remembered the incidents. If not, he would have been quite hard pressed to figure out how to defend himself.

In contrast, President Jones was put on adequate notice that (1) he needed to clarify or explain his statements at a particular recent meeting on Marco Island, (2) he needed to deny or explain how Union money could be going to his wife while she was in a distant foreign country, and (3) he needed to explain whether or why Union funds were used to buy his meals near his home. These charges were easily "specific enough to inform [President Jones] of the offense[s] that he ha[d] allegedly committed." *Hardeman*, 401 U.S. at 245 (internal quotation marks omitted). He makes no attempt to describe

what more he needed to prepare for the hearing. *See Johnson v. Nat'l Ass'n of Letter Carriers Branch 1100*, 182 F.3d 1071, 1074–75 (9th Cir. 1999) ("The Supreme Court has interpreted § 411(a)(5) to require that charges be 'specific enough to inform the accused member of the offense that he has allegedly committed.' . . . The level of detail required is that needed to notify the accused of the incidents that form the basis of the charge so that he or she may prepare a defense." (quoting *Hardeman*, 401 U.S. at 245)).

### 2.     Bias

Mr. Jones also claims he was not "afforded a full and fair hearing" under 29 U.S.C. § 411(a)(5)(C) because his tribunal was biased. He points to Vice President Simmons's declaration, which (1) laid out the evidence Vice President Simmons had gathered against him; (2) noted that Vice President Simmons had "shared this information" with Vice Presidents Baca, Stadnick, and Fultz; and (3) reported that they had "all expressed outrage by these inappropriate expenditures." Aplt. App., Vol. II at 2–4. Mr. Jones infers that the tribunal had "'prejudg[ed]'" his guilt, which was "'sufficient to taint the proceedings and constitute a denial of the right to a full and fair hearing[.]'" Aplt. Br. at 59 (quoting *Knight v. Int'l Longshoremen's Ass'n*, 457 F.3d 331, 343 (3d Cir. 2006)).

The Vice Presidents respond that the record is devoid of any suggestion that they belonged to a rival faction or disagreed with President Jones on issues of Union governance, or that there was any other discord *before* he revealed his misuse of Union funds at the February meeting. Thus, unlike in *Knight*, where the Third Circuit held that a committee member was biased because he had "antipathy" toward the accused's

Page 21

coalition—even admitting at trial that this antipathy impacted his judgment in the accused's case—here, the Vice Presidents' outrage was not unfairly rooted in factional alliances or intra-union politics. 457 F.3d at 343. It was founded, quite reasonably, on seeing extensive evidence of the alleged misconduct. *Cf. Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.").

Similarly, Mr. Jones complains of the structural bias in having the Vice Presidents act as "the complainants, the prosecutors, and the judges." Aplt. Br. at 60. But that arrangement in itself does not violate due process under the LMRDA. The D.C. Circuit has ruled that there is "nothing inherently wrong with the union constitution authorizing [one official] to determine probable cause, prefer the charge, appoint a trial committee, and then make the ultimate decision based on the committee's recommendations." *Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188, 1195 (D.C. Cir. 1996). The court distinguished the union dispute from a criminal case, "where due process requirements are more stringent," and "such an overlap of investigative, prosecutorial, and adjudicatory functions would violate due process." *Id.* As with administrative agencies, requiring unions "to maintain a rigid separation of functions . . . would deprive [them] of the flexibility needed to conduct their complex and varied functions." *Id.*; *see also United States v. Int'l Brotherhood of Teamsters*, 247 F.3d 370, 385 (2d Cir. 2001) ("Not all of the due process protections available in the federal courts apply to union

disciplinary proceedings."); *Wellman v. Int'l Union of Operating Eng'rs*, 812 F.2d 1204, 1205 (9th Cir. 1987) ("While we apply traditional due process concepts, we recognize that a union has a significant interest in controlling internal discipline, and so do not require the union's disciplinary proceeding to incorporate the same protections found in criminal proceedings.").

To be sure, in *Wildberger* itself the union official's combined "prosecutorial and adjudicatory functions"—together with undisputed evidence that the accused was at one time his "political opponent" and had repeatedly criticized him—meant the risk of unfairness was "intolerably high." 86 F.3d at 1195–96 (internal quotation marks omitted). But we see no such evidence here. For instance, far from being President Jones's "political opponent," Vice President Simmons received at least seven Union appointments directly from President Jones in the five years preceding this controversy.

Further, the Vice Presidents took significant steps to ensure the integrity of President Jones's hearing. Vice President Fultz properly recused himself from voting because he acted as the prosecutor. And there is no evidence suggesting that he took part in the tribunal's deliberations. *Cf. Stein v. Mutuel Clerks' Guild of Mass., Inc.*, 560 F.2d 486, 491 (1st Cir. 1977) (concluding that union members were denied full and fair hearings because the prosecutor "took an active part in the private deliberations" of the hearing tribunal).

This situation more closely resembles that in *Sawyer v. American Federation of Government Employees, AFL-CIO*, 180 F.3d 31, 36–37 (2d Cir. 1999). There, a union member claimed he was not afforded a full and fair hearing because the union official

who appointed the trial committee and chose to expel him was biased against him. *See id.* at 33–34, 36. The Second Circuit rejected his argument, reasoning that "there was no indication of any personal conflict" between him and the union official, the official's actions were "incident to his duties under the Union constitution," the member's violation of the constitution was "clear," and he never "even claim[ed]" to have evidence disputing the violation. *Id.* at 36–37. These reasons apply here with equal force. Thus, we reject Mr. Jones's contention.

### 3.     Representatives

Mr. Jones did not attend the disciplinary hearing. But he argues that the tribunal refused to give him an opportunity to review and rebut the evidence because his two "representatives" were not granted access to it. Aplt. Br. at 60–61. These individuals said, however, that they were not Mr. Jones's representatives. After one of them, Kyle Evenson, asked if they could see a binder introduced as evidence, the hearing officer declined because they were only "observers." Aplt. App., Vol. II at 41. Mr. Evenson then apparently confirmed it, replying, "I may be an observer, but I am still a member of this—[cut off by hearing officer]." Aplt. App., Vol. II at 41. And after being asked directly whether he was "assigned" to the hearing, Mr. Evenson replied, "It doesn't matter. I can come in here even as a member just walking off the street." Aplt. App., Vol. II at 42. The hearing officer was justified in denying the request of the two men to review evidence.

All told, President Jones received a "full and fair hearing" under 29 U.S.C. § 411(a)(5).

###### C.       District-Court Proceedings

Finally, Mr. Jones contends that the district court erred by giving him only seven days to respond to the Vice Presidents' summary-judgment motion and not allowing him to conduct discovery. Mr. Jones concedes he did not preserve these issues before the district court. But he argues that doing so would have been futile, since the court had denied the Union's request to conduct discovery and arbitrarily expedited the summary-judgment schedule.

This argument is unconvincing. The court never denied the Union's oral request for discovery, Mr. Jones does not point to anything the court said suggesting it had made up its mind on the request, and its decision to set an expedited briefing schedule made eminent sense, as we will discuss below. Thus, we review only for plain error. *See Stender v. Archstone-Smith Operating Tr.*, 958 F.3d 938, 948 (10th Cir. 2020) ("If the issue was not properly preserved in district court, we can reverse only if the requirements of the plain-error doctrine are satisfied."). "To obtain relief under that standard, the party must show (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted). Mr. Jones's argument fails at the first step. We see no error.

The district court's decision to set an expedited briefing schedule was well warranted. It had been informed that Mr. Jones had resigned from the presidency and "unilaterally named a successor." Aplt. App., Vol. III at 177. And Mr. Jones, his wife, and Secretary-Treasurer Creeden apparently had just been collectively paid over half-a-million dollars in unused vacation time. Because "the parties [had] demonstrated an

Page 25

unusual capacity for mischief," the district court determined that "time [was] of the essence." Aplt. App., Vol. III at 178.

As for Mr. Jones's argument that the summary-judgment hearing should not have been held without his being able to conduct further discovery, the district court did not explicitly prohibit discovery. Of course, discovery would have been impossible in the short period before the hearing. But if Mr. Jones thought that more time was necessary to conduct discovery before responding to the motion for summary judgment, he should have invoked Fed. R. Civ. P. 56(d), which addresses that circumstance. It states, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery." Mr. Jones admits that he never requested additional time for discovery. We can therefore easily dispose of his argument. Because Mr. Jones "failed to invoke Rule 56(d)," the district court "did not err in granting summary judgment based on the evidence and arguments presented to it by both parties." *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1264 (10th Cir. 2020) (citation omitted).

## III.   CONCLUSION

We **AFFIRM** the district court's order granting summary judgment. We **GRANT** the Union's motion for permission to file an amicus brief.